CARLSTEDT ASSOCIATES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Carlstedt Associates, Inc. v. Commissioner
Docket No. 42063-85
United States Tax Court
T.C. Memo 1989-27; 1989 Tax Ct. Memo LEXIS 26; 56 T.C.M. (CCH) 1090; T.C.M. (RIA) 89027; January 12, 1989
Steven Sonberg, Ursula Mancusi-Ungaro, James H. Barrett, for the petitioner. Claudine D. Ryce, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioner's Federal income tax *28 for its fiscal year which ended on August 31, 1981 in the amount of $ 213,662.41. The issues for decision are: (1) whether petitioner, an accrual basis taxpayer, must include in its income for its 1981 fiscal year the amounts received by it as commissions because all events occurred in 1981 that fixed petitioner's right to receive the income or because it received such commission income under a claim of right; (2) if petitioner is required to include the commissions it received in its fiscal year 1981 income, whether it is entitled to deduct in its fiscal year 1981 amounts due to other brokers for sales made by them on its behalf; (3) whether petitioner is entitled to defer inclusion of any portion of the commission income it received in its fiscal year 1981 to its 1982 fiscal year, pursuant to Rev. Proc. 71-21, 1971-2 C.B. 549, because such income is attributable to services that were to be performed within its 1982 fiscal year; and (4) whether petitioner should be allowed to carry back its fiscal year 1982 operating loss created by a downward adjustment of its 1982 fiscal year income to its fiscal year 1981, or whether it elected to relinquish such carryback in favor *29 of a carryover. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. During the years involved in this case, Carlstedt Associates, Inc. (petitioner), maintained its offices in Tampa, Florida. It filed its corporate income tax returns with the Internal Revenue Service Center in Atlanta, Georgia. Petitioner kept its records and filed its returns on an accrual basis for a fiscal year ending on August 31. Petitioner's president and sole shareholder for its fiscal years 1979, 1980, 1981, 1982, and 1983 was James J. Carlstedt. Petitioner is now, and was at the time of the filing of its petitioner in this case, an inactive corporation. During the years at issue, petitioner was a member firm of the National Association of Securities Dealers (NASD) and specialized in private securities offerings. Petitioner was also registered with the Securities and Exchange Commission (SEC). In April of 1981, petitioner entered into a broker-dealer arrangement with Ramco Well Service, Inc. (Ramco), a Texas corporation. Ramco was an oil field service company with offices located in Oklahoma City, Oklahoma. In 1981 and 1982, Erwin H. Sullivan was the vice president *30 and chief financial officer of Ramco. Under the broker-dealer arrangement, petitioner became the exclusive agent for the sale of limited partnership units offered by Ramco Equipment, Ltd.-1981-1 (the partnership), an Oklahoma limited partnership in which Ramco was the sole general partner. The limited partnership interests were not to be offered to the general public so that the offering would qualify as a private placement and be exempt from registration under sec. 4(2) of the Securities Act of 1933, ch. 38, tit. I, sec. 4, 48 Stat. 77, 15 U.S.C. sec. 77(d). As exclusive sales agent for the offering, petitioner was required to locate qualified investors, raise enough capital to activate the partnership, and provide Ramco with certain documentation from prospective investors. If petitioner met certain sales quotas, it was to receive cash commissions equal to 8 percent of the amount received for unit subscriptions sold, a right of first refusal to sell all private programs sponsored by Ramco in 1981 and 1982, and stock warrants entitling petitioner to purchase stock in Ramco, the general partner. The terms of the broker-dealer arrangement were memorialized *31 in a letter agreement (the letter agreement), dated April 24, 1981. The agreement provided, in part, that: Ramco Well Service, Inc. ("Ramco") confirms the following Agreement with you with respect to an offering to selected persons of Units in the Ramco Equipment, Ltd. - 1981-1 (the "Partnership") * * *. 1. Offering Price. Units in the Partnership are offered at a subscription price of $ 50,000 per Unit. The minimum subscription for each Participant is three Units. No subscription will be binding until the $ 1,650,000 in aggregate subscriptions required to activate the Partnership have been secured and the subscription has been accepted by Ramco. 2. Commission Payable by Ramco. Provided the aggregate minimum subscriptions of $ 1,650,000 required to activate the Partnership have been secured, Ramco will pay cash commissions of up to eight percent (8%) on the Unit subscriptions sold by you and accepted by Ramco. Within five (5) business days after the receipt by Ramco of the subscription payment, the cash commission will be due and payable. Commissions are payable only after subscription payments are received and accepted. * * * 3. Representations and Warranties *32 of Ramco:
* * * (b) * * * The Memorandum, as of its date and at all times subsequent thereto, up to and including the Closing Date, will not include any untrue statement of material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading. * * * 4. Representations and Warranties to Ramco. You represent and warrant to Ramco that: * * * (b) You are duly registered pursuant to the provisions of the Securities Exchange Act of 1934 as a dealer and are duly registered as a broker-dealer in the required states. You * * * agree to comply with all statutes and other requirements applicable to you as a broker-dealer pursuant to those registrations. * * * (d) This Agreement, when accepted and approved, will be duly authorized, executed and delivered by you and is a valid and binding agreement on your part in accordance with its terms. * * * 8. Right of First Refusal. We hereby grant to you a right of first refusal to sell all private programs sponsored by Ramco for 1981 and 1982. This right of first refusal is subject to your ability to sell private program subscriptions totaling $ 6,600,000 *33 in 1981 and your commitment to offer all private programs on competitive industry terms. * * * The letter agreement was signed by Mr. Sullivan, as vice president of Ramco, and provided a space in which Mr. Carlstedt, as president of petitioner, was to indicate petitioner's acceptance of the agreement. Mr. Carlstedt did not execute the agreement because, as drafted, it contained no reference to the stock warrants which had been part of the broker-dealer arrangement. However, Mr. Carlstedt considered petitioner to be bound by the April 24, 1981 letter agreement and caused it to conduct itself and its selling efforts, with respect to the partnership offering, in accordance with the letter agreement. According to the private placement offering memorandum (the offering memorandum) which was distributed by petitioner to prospective investors, the limited partnership was organized on December 31, 1980 under the laws of the State of Oklahoma for the purpose of acquiring, owning, and operating oil and gas well servicing and drilling equipment. Approximately 65 percent of the cost of acquiring and maintaining the servicing and drilling equipment was to be financed by obtaining a nonrecourse *34 loan (the partnership bank loan), which was to be secured by substantially all of the partnership's assets. The offering memorandum states that, if the partnership fails to obtain the partnership bank loan, the amended certificate of limited partnership will not be filed and, therefore, the partnership will not be activated. The offering memorandum also describes the terms of the offering, including the circumstances under which the subscription agreements of investors would be accepted and the circumstances under which the partnership would be activated. The offering memorandum states that any single investor must subscribe to a minimum of three partnership units at a price of $ 50,000 per unit, unless the general partner waives this requirement. It further states that the units are to be sold only to those persons who are acceptable to the general partner. Since a substantial portion of the anticipated benefits of the investment took the form of tax deferrals and credits, a prospective investor's acceptability was, in large part, dependent on his financial ability to utilize such tax benefits as well as his ability to absorb the potential risks associated with the investment. *35 Each potential investor was required to submit to the general partner a completed offeree questionnaire disclosing his net worth, his yearly income, his prior investment experience, and other financial information. Each potential investor was also required to submit an executed subscription agreement agreeing to irrevocably subscribe to a limited partner's interest equal to a certain dollar amount and to irrevocably appoint Ramco as his attorney-in-fact for purposes of filing an amended limited partnership agreement. Ramco was given sole discretion to accept or reject a subscription agreement. The subscription agreement was deemed accepted only when the agreement was signed on behalf of Ramco and an amended certificate of limited partnership, naming the investor as a limited partner, was filed with the Secretary of State of Oklahoma. Each potential limited partner was required to submit cash or a check, payable to the partnership, in an amount equal to $ 50,000 for each partnership unit he wished to purchase or, in lieu of submitting immediate payment of the full $ 50,000 per unit, to finance up to half the purchase price of each unit (i.e., $ 25,000 per unit) by causing the *36 partnership to borrow that amount on his behalf. Under the subscription agreement, if the investor elected to finance a portion of the purchase price, he was required to submit, in addition to the other required documentation, (1) an "EQUITY LOAN NOTE" for the amount he wished to finance (the equity note); (2) an "EQUITY LOAN ASSUMPTION AGREEMENT" (the assumption agreement); (3) an "EQUITY LOAN DISTRIBUTION DISBURSEMENT AUTHORIZATION;" and (4) a letter of credit equal to the amount of the subscription price per unit not paid in cash. The principal of the equity note was not due until December 31, 1985. However, the partnership was permitted, at the sole discretion of Ramco, to apply the potential partner's distributable share of any subsequently earned partnership income towards the principal. The equity note accrued interest starting on July 1, 1981 payable quarterly at a rate of one and one-half percent above prime. The letter of credit was to be irrevocable and was to secure the equity note. It could be drawn down at any time at Ramco's discretion if the investor defaulted on the equity note or if an issuing bank failed to renew its letter of credit. Under the assumption *37 agreement the investor agreed to assume his pro rata share of the partnership debt incurred on behalf of the limited partner investors. The date of maturity and interest rate on the equity loan to be assumed by the investor was identical to the date of maturity and interest rate under the equity note executed by the investor. The assumption agreement provided that the equity loan, incurred by the limited partnership on behalf of the investors, was to be secured by the same letters of credit which secured these equity notes. The "EQUITY LOAN DISTRIBUTION DISBURSEMENT AUTHORIZATION" merely acknowledged that the partnership was to negotiate an equity loan on behalf of the investors and provided the lending bank with the same right to inspect partnership books as the investors were to enjoy in their capacity as limited partners. The letter of credit was required to have an expiration date of December 31, 1985, or be automatically renewable to such date. Two form letters of credit were supplied with the offering memorandum. In one part of the offering memorandum it is stated that the letters of credit are to be issued in favor of the partnership and then assigned to the lending bank, *38 but in another section of the same memorandum, the letters are required to be issued directly in favor of the lending bank. In the amended limited partnership certificate, the subscription agreement, the equity loan note, and the assumption agreement, no beneficiary of the letters of credit is specified. In one of the form letters of credit supplied with the offering memorandum, a specific bank, Penn Square Bank, N.A. of Oklahoma City (Penn Square), is the named beneficiary of the letter of credit, but in the other form letter of credit, the beneficiary designation is left blank. [1]
The offering memorandum at one point states that each investor who chooses to finance a portion of his purchase must submit a letter of credit from, "* * * a state or national bank acceptable to the lending bank * * *." The subscription agreement contains identical language but the assumption agreement states that the letter of credit must be, "* * *39 * satisfactory to the Lender * * *." At another point, the offering memorandum states that the letter of credit must be, "* * * from an acceptable state or national bank * * *." The amended certificate of limited partnership contains this same language. Under the provisions of the amended certificate of limited partnership, acceptance was evidenced by the execution of the subscription agreement by the prospective investor and Ramco, but was not conditioned on the filing of the amended certificate. The offering memorandum provided that the amended certificate of limited partnership would not be filed and, therefore, the partnership would not be activated unless a minimum of $ 1,650,000 in "limited partners' capital" had been raised prior to the expiration of the subscription period which could be extended to June 30, 1981. The term, "limited partners' capital," was defined as the cash contributions (including proceeds from the equity loan) made by all limited partners to the partnership. The offering memorandum further provided that, until the amended certificate of limited partnership was filed, the cash payments received from potential investors were to be placed in an escrow *40 account and that, if the amended certificate was never filed, the funds, plus any interest earned, would be returned to the investors. Once the amended certificate was filed and the partnership commenced operations, no further subscriptions could be accepted and, therefore, no additional limited partners could be admitted. Although, under the letter agreement, petitioner was the exclusive agent for the sale of partnership units, petitioner was assisted in its efforts to sell the minimum amount of subscriptions by other brokers and broker-dealers (third-party brokers) operating in Tampa and St. Petersburg, Florida. If these third-party brokers merely introduced the prospective investor to petitioner's president, Mr. Carlstedt, they were to receive 50 percent of the commission that would eventually be payable to petitioner. If the third-party brokers essentially sold the investment to the prospective investor, they were to receive seven-eighths of petitioner's commission, even though the subscription documents were still transmitted through petitioner. Petitioner began its selling efforts on April 24, 1981, the date of the offering memorandum and the date the subscription period *41 began. By June 30, 1981, the end of the subscription period as extended, petitioner had secured, either directly or through third party brokers, subscription agreements for at least 99.3 partnership units. [2] Only one subscriber chose to purchase a single partnership unit entirely with cash. The remaining subscribers chose to finance the purchase of a part of their partnership units by causing the partnership to borrow a portion of the purchase price on their behalf. As petitioner secured subscription agreements from prospective investors, it would mail subscription packets containing *42 the documents and cash it received from the investor to Ramco's offices in Oklahoma. By June 30, 1981, Ramco had received from petitioner a minimum of $ 2,507,500 in cash ($ 50,000 in cash for one unit plus $ 25,000 in cash for the other 98.3 units) and total aggregate subscriptions of at least $ 4,965,000 ($ 50,000 multiplied by 99.3 total units). However, most of the subscription packets sent to Ramco did not contain all the documents required by the offering memorandum or the subscription agreements. Although Ramco received an executed equity note from every investor (except the single investor who paid for his unit entirely in cash), only two or three of the subscription packets contained executed letters of credit. Most of the subscription packets only contained the personal financial statements of the prospective investor. Mr. Sullivan, acting on behalf of Ramco, would take these statements to Penn Square and request the issuance of a letter of credit on behalf of the investor. Despite Mr. Sullivan's repeated attempts to hasten the process, the letters of credit were not issued by Penn Square until after June 30, 1981. As of the end of the subscription period on June 30, 1981, the *43 partnership had not obtained all the documents clearly required under the terms of the offering memorandum, the subscription agreement, and the amended certificate of limited partnership. However, on June 30, 1981, the president of Ramco, Mr. Thomas Corder, indicated Ramco's acceptance of the subscriptions by signing and dating a copy of each subscription agreement on behalf of Ramco. The acceptance process was completed when, on July 15, 1981, the partnership filed an amended certificate of limited partnership with the State of Oklahoma. On August 26, 1981, Mr. Sullivan drew a check for $ 426,400 on an account of the partnership naming petitioner as payee. The check was signed on behalf of Ramco, the sole general partner of the partnership. At least $ 6,000 of the payment was considered a non-accountable offering cost allowance which was intended to cover petitioner's out-of-pocket expenses. The amount of $ 420,000 of the payment was intended to cover the commissions petitioner earned as a result of his participation in the partnership offering. Petitioner received the check on August 28, 1981, three days before the end of its 1981 fiscal year. Petitioner placed a portion of *44 the commission payment in its corporate account. It used a portion of the commission payment to purchase certificates of deposit in petitioner's name. No attempt was made to segregate the commission payment from other corporate funds because, as of August 31, 1981, Mr. Carlstedt believed that the commissions had been fully earned by petitioner. He assumed, from the arrival of the commission check, that the letters of credit had finally been obtained and that the equity loan had been funded. As of August 31, 1981, the letters of credit had been issued by Penn Square, but no equity loan had, as of yet, been obtained by the partnership. Over the next few weeks, petitioner paid out commissions of over $ 213,000 to various third party brokers who had assisted petitioner in the sale of partnership units. [3] Petitioner believed these third party commissions were due and payable at the same time the commission owed to him had become due and payable. Around the third week of September in 1981, Mr. Sullivan called Mr. Carlstedt to inform him that the partnership was experiencing difficulties in locating a bank which would fund the equity loan on the strength of letters of credit issued *45 by Penn Square. Mr. Sullivan told Mr. Carlstedt that there was a possibility that the investor's cash payments, including the commissions disbursed to petitioner, might have to be refunded. *46 Mr. Sullivan was under the impression that the equity loan had already been obtained when he had the commission check sent to petitioner. Mr. Sullivan was of the opinion that the investors could rescind their subscription agreements and force the return of their money until the equity loan was fully funded. Mr. Sullivan never asked petitioner to return the amount of the commission which had been paid to it in August. He did, however, suggest to Mr. Carlstedt that the money not be spent. Mr. Carlstedt, immediately upon being called by Mr. Sullivan, called the third party brokers to inform them that the equity loan had not yet been funded. He did not ask the third party brokers to return the commissions that petitioner had paid to them. He suggested that they not spend the money. Mr. Carlstedt also began contacting investors to inform them of the situation and reassure them that the difficulties in obtaining an equity loan would be overcome by the end of their tax year. Mr. Carlstedt was of the opinion that these contacts with investors were within the scope of his duties as exclusive sales agent for the partnership. He had not contemplated the difficulties which arose with *47 respect to Penn Square Bank when petitioner entered into the broker-dealer arrangement with Ramco. In late October, petitioner and Ramco entered into an amendment (the amendment) to the April 24, 1981 letter agreement. Although the amendment is dated October 29, 1981, it stated that its effective date was April 24, 1981. The amendment provided, in accordance with the original broker-dealer arrangement, that petitioner would be entitled to warrants enabling it to purchase stock in Ramco if it sold a specified amount of partnership units. In addition, the amendment reduced the amount of private program subscriptions petitioner would have to sell in order to earn a right of first refusal to sell private placement programs sponsored by Ramco in 1981 and 1982. At the request of Ramco, the amendment modified the first paragraph of section 2 of the original letter agreement. Instead of providing that, "Within five (5) business days after the receipt by Ramco of the subscription payment, the cash commission will be due and payable. * * *," the paragraph, as amended, provided that, "Within three (3) business days after the funding of the permanent bank loan of the Partnership, the cash *48 commissions shall be due and payable. * * *." The clause, originally contained within the first paragraph, which stated that, "Commissions are payable only after subscription payments are received and accepted," was also omitted from the paragraph, as amended. The amendment was signed by Mr. Sullivan, on behalf of Ramco. It was signed and dated by Mr. Carlstedt, on behalf of petitioner. As a registered broker-dealer, petitioner was required to file a financial and operational combined uniform single report (FOCUS report) with the NASD and the SEC. A FOCUS report was due within 17 days after the end of each calendar quarter and in addition such a report was due within 17 days of the end of petitioner's fiscal year. Each FOCUS report contained a statement of financial condition (e.g., a balance sheet), a statement of income or loss, and a statement of changes in owner's equity. In addition, each FOCUS report was required to contain a computation of net capital, a computation of aggregate indebtedness, and a computation of minimum net capital requirements. In its FOCUS report for the period ending August 31, 1981, which was filed late on October 8, 1981, petitioner's aggregate *49 indebtedness is shown as $ 411,009. In addition to quarterly FOCUS reports, petitioner was also required to file an annual audited financial statement with the NASD and the SEC. The statement was due within 60 days after the end of petitioner's fiscal year on August 31. The submitted statement was required to contain much of the same information shown in the FOCUS report, including a computation and reconciliation of net capital requirements. Petitioner's annual audited financial statements, as well as its quarterly FOCUS reports, were prepared by the accounting firm of Hanna, Lemar & Co. (Hanna, Lemar). Mr. Edward Hanna, a certified public accountant and president of Hanna, Lemar, first became acquainted with the Ramco offering through Mr. Carlstedt. Mr. Hanna subsequently brought the offering to the attention of his clients and several of them eventually invested in the partnership. He helped some of his clients complete their subscription packets. Mr. Hanna in this manner became somewhat familiar with the offering memorandum, the April 24, 1981 letter agreement, and the October 30, 1981 amendment to that agreement. Based on this personal familiarity, on discussions with *50 Mr. Carlstedt, on the opinions of Ramco attorneys, and on the opinions of the firm's attorneys, Mr. Hanna concluded that, under generally accepted accounting and auditing principles, the commissions should be treated as a liability in petitioner's audited financial statement for its fiscal year which ended on August 31, 1981. Specifically, the statement includes several entries which designate the $ 420,000 as a "Commission advance." Note 5 to the financial statement reads as follows: 5. COMMISSION ADVANCE
On August 28, 1981 $ 420,000 were advanced to Carlstedt Associates, Inc. by an entity it represents as a dealer-manager. These funds were characterized as loans to the Company until all requirements stated in dealer-manager agreement were satisfied. The remaining requirement that had not been satisfied on August 31, 1981 was the acquisition of an equity loan for the entity. Funding of loan was made in December 1981 and at that time the commissions advanced were to be treated as commission income. The equity loan was obtained by the partnership on December 4, 1981 from Michigan National Bank (Michigan National) in Battle Creek, Michigan. The promissory note, which *51 is dated November 25, 1981, provides for interest at a rate of one and a half percent above prime on a principal of $ 2,602,500 and states that the note is secured by unconditional irrevocable letters of credit issued for the benefit of Michigan National by other banks that have extended credit to the limited partners of the partnership. After the equity loan had been funded, Mr. Sullivan called Mr. Carlstedt and informed him that the deal had finally been closed and that petitioner was now entitled to the commissions that it had previously received. Hanna, Lemar prepared all of petitioner's Federal income tax returns for the years involved in this case. After preparation, the returns would be sent to Mr. Carlstedt who would review and sign them. He would then mail them to the Internal Revenue Service in Atlanta, Georgia. In their preparation of petitioner's Federal income tax return for its fiscal year which ended on August 31, 1981, Hanna, Lemar considered the possibility that, for tax accounting purposes, the $ 420,000 in commissions income might be properly includible in petitioners 1981 fiscal year. However, they opted for a treatment which would be consistent with petitioner's *52 audited financial statements and did not report the commissions as income on petitioner's 1981 return, but showed them as a "Commission Advance". [4]
Petitioner reported the $ 420,000 as commission income on its Federal income tax return, as well as its audited financial statement, for its fiscal year ended August 31, 1982. Petitioner also deducted the commissions it had paid to third party brokers on its 1982 return. Petitioner's return for its fiscal year ended August 31, 1982, discloses a net operating loss of $ 168.95. Because of the loss shown on petitioner's return for its fiscal year 1982, Mr. Hanna telephoned Mr. Carlstedt prior to mailing him the return and discussed with him the possibility of relinquishing petitioner's *53 right to carry back the loss to prior tax years pursuant to section 172(b). [5]
Petitioner's return for its fiscal year ended August 31, 1982, contains the following handwritten statement, "IN ACCORDANCE WITH CODE SECTION 172(b) TAXPAYER HEREBY ELECTS TO RELINQUISH THE ENTIRE CARRYBACK PERIOD WITH RESPECT TO THE CURRENT NET OPERATING LOSS." Immediately below this election a blank was provided for the date and Mr. Carlstedt's signature in his capacity as president of petitioner. Although the return is signed by Mr. Carlstedt as president of petitioner, the election contained within the return was never separately signed in the space provided. On its return for its fiscal year which ended August 31, 1983, petitioner acted in accordance with the section 172(b) election and carried forward the 1982 net operating loss to 1983. Petitioner's return for its fiscal year ended August 31, 1981 was filed on March 5, 1982. Petitioner's return for its fiscal year ended August 31, 1982 was filed, pursuant *54 to an extension, on May 16, 1983. In July of 1983, Robert Hansen, an internal revenue agent, contacted Mr. Carlstedt to inform him that petitioner's 1981 return was under examination. Mr. Hansen actually began his audit of petitioner in August of 1983 and, as a result of the audit, made several adjustments to petitioner's 1981 income as returned, including the inclusion of the $ 420,000 commission payment in petitioner's 1981 income. He discussed these adjustments with Mr. Hanna and a tax attorney, Stanley Rosenkrantz, both of whom held a power of attorney from petitioner. During this discussion, Mr. Rosenkrantz suggested that the election to relinquish any carryback of petitioner's net operating loss may not have been properly executed since it was not signed separately. Respondent in his notice of deficiency to petitioner increased its 1981 income as reported by $ 420,000 with the explanation that petitioner's gross receipts for its fiscal year 1981 were understated by this amount. OPINION Petitioner argues that it should be allowed to defer inclusion of the commission payment in its income until its 1982 fiscal year because (1) its method of accounting for the commission *55 income in the year following its receipt was in accordance with generally accepted accounting principles; (2) this method was required under regulations promulgated by the SEC; and (3) although it received payment in its 1981 fiscal year, its freedom to dispose of the funds as it saw fit was substantially restricted by certain securities statutes and regulations. From these contentions petitioner concludes the claim of right doctrine does not require inclusion of the commission income in its 1981 fiscal year. Petitioner further argues that its method of accounting for the commissions clearly reflected its income because, as of the end of its 1981 fiscal year, all events necessary to fix its right to the commissions had not occurred. Therefore, according to petitioner, respondent abused his discretion by requiring inclusion in the year of receipt. In our view the facts here clearly show that petitioner received payment of the commissions in its 1981 fiscal year under a claim of right and without restriction. For this reason we conclude that petitioner must include the commissions in gross income for its 1981 fiscal year. North American Oil Consolidated v. Burnet,286 U.S. 417 (1932), *56 is the most often cited in a long line of cases which apply the claim of right doctrine to both accrual and cash method taxpayers. In the North American Oil case, the Supreme Court required the taxpayer to include in its gross income for its 1917 taxable year an amount it had received as a result of a favorable judgment even though litigation over the taxpayer's right to the income continued until 1922. The Court explained the claim of right doctrine as follows: If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. North American Oil, Consolidated v. Burnet, supra at 424. Petitioner argues that to apply the claim of right doctrine in this case produces harsh results. Petitioner in effect uses this argument in an attempt to depart from reporting its income on the basis of its annual accounting period. The claim of right doctrine provides a necessary finality to each such annual accounting period and *57 has since become deeply rooted in the Federal tax system. United States v. Lewis,340 U.S. 590 (1951). In United States v. Lewis, supra, the Supreme Court required the taxpayer to include in his gross income the full amount of the bonus payment he received in 1944 even though he was later adjudged liable to return half of the payment. The taxpayer had argued that, although he had, in good faith, treated the full bonus as his own, his claim to the bonus was "mistaken" and, therefore, he should be excepted from application of the claim of right doctrine. However, the Supreme Court noted that nothing in the doctrine, as enunciated by the Court in North American Oil, permits an exception merely because a taxpayer is mistaken as to the validity of his claim. United States v. Lewis, supra at 591. As succinctly stated by the Court in the later case of Healy v. Commissioner,345 U.S. 278, 282 (1953), "A mistaken claim is nonetheless a claim, [citation omitted]." The facts here show that petitioner received payment of commission income within its annual accounting period which ended on August 31, 1981. It is *58 undisputed that, as of the end of petitioner's fiscal year, its president believed that petitioner was entitled to the commission since he assumed that the letters of credit were in place. As subsequently discussed, we do not consider that, prior to the amendment of the agreement between petitioner and Ramco after the close of petitioner's fiscal year 1981, the obtaining of the equity loan was necessary for petitioner to have earned its commission. Mr. Sullivan and Mr. Carlstedt both testified that they considered the obtaining of this equity loan to be necessary for petitioner to have earned its commission but believed that petitioner was entitled to payment of the commissions in August 1981 because of a mistaken belief that the equity loan was in place. Mr. Carlstedt and Mr. Sullivan each testified that he did not find out that his assumption as to the equity loan was incorrect until the third week in September, which is well after the close of petitioner's fiscal year. As of the end of petitioner's fiscal year on August 31, 1981, petitioner held the commissions under a claim of right. It is irrelevant that petitioner was mistaken as to the premise on which its claim rested. *59 The only relevant fact is that petitioner did, indeed, assert its claim to the income. This is shown, not only by the testimony of petitioner's president at trial, but also by petitioner's actions in depositing the funds in its own corporate bank account and using at least a portion of the funds to purchase certificates of deposit in its own corporate name. Despite these exercises of dominion by petitioner over the commission payments it received in its 1981 fiscal year, petitioner contends that its ability to dispose of the funds as it saw fit was subject to substantial restrictions and, therefore, the claim of right doctrine is inapplicable. There are two prerequisites to the application of the claim of right doctrine, both of which must be present at the close of the period within which the income is sought to be taxed. One prerequisite is that the taxpayer claim his entitlement to the funds at issue. The other prerequisite is that the funds be held by the taxpayer without restrictions as to their disposition. Healy v. Commissioner, supra at 283, and Illinois Power Co. v. Commissioner,792 F.2d 683 (7th Cir. 1986), affg. in part and revg. *60 in part 83 T.C. 842 (1984). If there are no restrictions on the taxpayer's disposition of funds which it holds, yet the taxpayer never claims any entitlement to the funds, the claim of right doctrine may not require inclusion of the funds in income. Illinois Power Co. v. Commissioner, supra at 688. Conversely, if the taxpayer claims entitlement to funds it has received, but its ability to dispose of the funds as it chooses is substantially restricted, the claim of right doctrine may not require inclusion of the funds in income. Under the facts in this case, petitioner's ability to dispose of the funds was not restricted at the close of the year 1981 so as to prevent application of the claim of right doctrine. In support of its contentions, petitioner points out that, under sec. 12(2) of the Securities Act of 1933, ch. 38, tit. I, sec. 12, 48 Stat. 84, 15 U.S. C. sec. 771(2), investors in the partnership would have had the right to sue both the partnership and petitioner (in its capacity as a sales agent of the partnership) to rescind their subscription agreements and recover their cash investment (plus interest) if any of the *61 partnership offering documents contained an untrue statement of a material fact or if they omitted a material fact which caused the documents to be misleading. Petitioner argues that in this case, the tax benefits and the total capitalization of the partnership, as revealed in the offering documents, are premised on the ability of the partnership to fund up to half of the subscription price by obtaining the equity loan. Petitioner argues that, since the equity loan had not been obtained before August 31, 1981, the partnership documents contained a material misstatement of fact as to capitalization and tax benefits. According to petitioner, under the facts as they existed at the end of its 1981 fiscal year, the investors were entitled to rescind their subscription agreements and recover their cash investment from the partnership and petitioner. Therefore, petitioner argues, its ability to dispose of the funds as it saw fit was subject to substantial legal restrictions. Petitioner's argument is similar to that advanced by the taxpayers in Healy v. Commissioner, supra. In that case, the taxpayers had received excessive salaries from a closely held corporation in *62 which they were both stockholders and officers. Upon audit by respondent, salary deductions taken by the corporation were disallowed and additional corporate-level taxes were assessed. However, because the corporation had fallen on hard times, the taxpayers were eventually forced to pay a portion of these taxes under the transferee liability provisions. In an argument similar to that advanced by petitioner, the taxpayers contended that, since all the facts which ultimately gave rise to the taxpayers' transferee liability were in existence at the end of the taxable year of receipt, the salary payments were subject to significant legal restrictions and they should not be forced to include them in income in the year of receipt. The Supreme Court rejected this argument. The Court noted that it was not certain, at the close of the years involved, that the Commissioner was going to audit the corporation or that the Commissioner was going to assert transferee liability against the taxpayers. The Court held that this type of potential or dormant restriction, which depends upon the future application of rules of law to present facts, is not a "restriction on use" sufficient to prevent *63 the application of the claim of right doctrine. If we assume in this case that the partnership might never have obtained the equity loan and consequently the investors might have been entitled to sue petitioner and the partnership to recover their cash investment, it would not cause us to agree with petitioner that it did not receive the commissions in its fiscal year 1981 under a claim of right. Under the above assumptions, petitioner might have eventually been legally required to return the commissions. [6] However, these would have been mere possibilities, at the close of petitioner's 1981 fiscal year. As in Healy v. Commissioner, supra, any legal restriction which might subsequently materialize would be entirely dependent on the future application of securities law to a present factual situation.[7] The existence of these mere possibilities is not a "restriction on use" sufficient to prevent the application of the claim of right doctrine to the commissions petitioner received. [8]
*64 Petitioner next points out that, under the offering documents, the subscribers were entitled to cancel their subscriptions at any time prior to acceptance of the subscription agreements by the general partner, Ramco. According to petitioner, Ramco was not permitted, under the partnership offering documents, to accept a subscription unless it was accompanied by a letter of credit which would be acceptable to the particular bank that had volunteered to fund the equity loan. Petitioner states that, at the time Ramco accepted the subscriptions, no particular bank willing to fund the equity loan had been located. For this reason, according to petitioner, it could not be known whether the letters of credit submitted with the subscription agreements, or those subsequently obtained prior to the end of petitioner's fiscal year, were acceptable to the lending bank. Petitioner argues that Ramco's acceptance of the subscription agreements in June of 1981 was invalid and the subscribers were still entitled, at the close of petitioner's 1981 fiscal year, to rescind their subscriptions and demand the refund of their cash investments (plus interest). Petitioner then concludes that, if the *65 partnership was forced to refund the subscribers' money, it would have been required to refund its commission to Ramco since, under the broker-dealer arrangement, no commission was payable on its sale of a partnership unit until the general partner accepted that particular subscriber. Finally, petitioner contends that, in recognition of this possibility, it retained the commission payment, within its corporate structure, in the form of cash or near-cash assets and that this constituted a substantial restriction on its use of the funds. The short answer to petitioner's contention is that any such restrictions on the use of the commission payments were imposed by petitioner, itself. The facts in this regard are similar to those in Estate of Whitaker v. Commissioner,259 F.2d 379 (5th Cir. 1958), affg. 27 T.C. 399 (1956). [9] In that case, a horse breeder, who employed the accrual method of accounting, was paid his stud fees in the year preceding the births of the resulting foals. Under the terms of the breeder's verbal contracts, he was required to refund the fees if the foals were not born alive in the following year. The breeder treated the payments *66 as deposits in his books of account. He purchased cashier checks in amounts equal to the respective fees and held the checks until the following year when the foals were born alive. The Fifth Circuit ruled that the taxpayer received payment under a claim of right and, therefore, must include the fees in income in the year of receipt. In reaching its decision, the court noted that, although the taxpayer chose to hold the fees as deposits or advances until live foals were born, this was his own personal decision. The verbal agreements between the breeder and his customers did not require that the funds be placed in escrow or in trust. In short, there was no contractual restriction which prevented the breeder from enjoying full unrestricted use of the fees. In the instant case, the broker-dealer arrangement between petitioner and Ramco did not require that the commissions be placed *67 in escrow or in trust until acceptable letters of credit were obtained and the equity loan was funded. Petitioner may have chosen to retain the funds in cash or near-cash assets to cover a potential liability to repay the commissions. However, this was a choice of petitioner (or, more accurately, of its president, Mr. Carlstedt). We also note that petitioner imposed these restrictions on itself only after the close of its 1981 fiscal year because of Mr. Carlstedt's claimed belief that it was not entitled to the commissions the equity loan had been funded. Mr. Carlstedt testified that this belief was not formed until he spoke to Mr. Sullivan in September of 1981, well after the close of petitioner's 1981 fiscal year. Petitioner had full unrestricted use of the funds and, thus, received an economic benefit in its 1981 fiscal year. If in fact Mr. Carlstedt, petitioner's president, was of the opinion that petitioner was not entitled to the commission payment, he made no effort to have petitioner disgorge itself of the funds by returning them to Ramco, by placing them in escrow, or by placing them in trust. Thus, petitioner consistently exercised complete dominion and control over *68 the commissions from the time it received them. Petitioner urges that its use of the commission funds was subject to certain governmentally imposed restrictions and, therefore, the claim of right doctrine is inapplicable. Petitioner points out that, as a broker-dealer registered with the NASD and SEC, it was required to maintain its accounts in accordance with generally accepted accounting principles. In order to meet this requirement, petitioner claims that it was forced to account for the commission payment as a liability on its FOCUS reports and its audited financial statements until the equity loan had been funded. Petitioner states that as a consequence of accounting for the commissions as a liability instead of as income, it was forced to retain the funds in the form of "ready assets" within its corporate structure, rather than distributing them to its sole shareholder or using them to pay its expenses, in order to meet minimum net capital requirements also imposed on it by NASD and the SEC. According to petitioner, the instant case is similar to the Ninth Circuit case of Mutual Telephone Co. v. United States,204 F.2d 160 (9th Cir. 1953), and the Seventh *69 Circuit case of Illinois Power Co. v. Commissioner,792 F.2d 683 (7th Cir. 1986). In both cases, the courts refused to apply the claim of right doctrine where the taxpayer's failure to include receipts in gross income was in accordance with a method of accounting prescribed by a governmental agency. In our view both cases are readily distinguishable from the instant case. In Mutual Telephone Co., the court held that the claim of right doctrine could not be invoked by the Commissioner to force inclusion of certain excess funds, collected pursuant to a governmental order approving increased installation charges, in a telephone company's income in the year of receipt. Mutual Telephone Co. v. United States, supra at 161. However, the dominant factors which led to the court's decision in Mutual Telephone were the controlled circumstances under which the company received the funds and the restrictions imposed as to their disposition. The governmental order specifically stated that it would be improper to permit the increase to be passed on to the company's stockholders in the form of increased dividends. The governmental order also required *70 that the excess funds be credited to a specific account set up in the company's books pending further direction from the governmental agency as to the disposition of the funds. Thus, the order required more than a mere bookkeeping entry. It, in effect, directed the taxpayer to retain custody of the funds until the government directed further disposition. Mutual Telephone Co. v. United States, supra at 161. In the instant case, there was no specific order from a regulatory agency which directed petitioner to collect the commission payment and then credit the funds to a special account pending the agency's final decision as to the disposition of the funds. Petitioner was required to submit quarterly FOCUS reports and annual audited financial statements which were to be prepared in accordance with generally accepted accounting principles. However, this requirement, by itself, did not impose on petitioner a specific obligation to credit the commission income to a liability account. The commissions were credited to a "commission advance" account at the behest of petitioner's accountant, rather than pursuant to a specific governmental order. Petitioner was required *71 to maintain certain levels of net capital and, as a consequence of accounting for the commissions as a liability, the amount of capital petitioner was required to maintain was increased. However, at most, petitioner was required to retain additional net capital of only $ 23,000. [10] The actual amount of capital petitioner was required to retain as a result of accounting for the commission as a liability was far less than the commission payment petitioner received. Therefore, petitioner's claim that its use of the entire $ 420,000 was restricted pursuant to NASD and SEC regulation is in error. Illinois Power Co. v. Commissioner, supra, is also readily *72 distinguishable from the instant case. In that case, a state regulatory agency ordered a power company to increase its rates in order to encourage conservation of electricity. Although the order did not specifically require that the excess revenues collected by the company be placed in escrow or in trust, the order did make clear that the company would never be able to keep the money it collected. The order also required that the money be accumulated in a "special fund" until the agency determined how and when the company would be required to disgorge itself of the money it had collected. The Seventh Circuit held that, even though there was no explicit restriction on the company's disposition of, or right to, the money (i.e., the order did not set a specific date for disgorgement nor did it specifically require that the company pay interest on the collected funds), the claim of right doctrine was not applicable since the taxpayer never made a formal claim of right to the income. Illinois Power Co. v. Commissioner, supra at 688. The court stated that: The underlying principle is that the taxpayer is allowed to exclude from his income money received under an *73 unequivocal contractual, statutory, or regulatory duty to repay it, so that he really is just the custodian of the money * * *. [Emphasis supplied.] In the instant case, it is clear that petitioner did hold the income under a claim of right. It was, at no point, under an unequivocal contractual, statutory, or regulatory duty to repay the commissions either to Ramco or the investors. This, coupled with the fact that petitioner's disposition and use of the commission payment was not restricted in any way, mandates application of the claim of right doctrine. [11] As stated by the Seventh Circuit: Where, unlike the case of a trustee or a collection agent or a borrower, the taxpayer's obligation to refund or rebate or otherwise repay money that he has received is contingent, the money is taxable as income to him * * * *. [Citations omitted.] *74 Illinois Power Co. v. Commissioner, supra at 689. Finally, petitioner contends that, even though it may have received the commission payment under a claim of right and without restriction as to its use, the claim of right doctrine is not dispositive where an accrual basis taxpayer is concerned. Instead, according to petitioner, "the clear reflection of income doctrine applies." Petitioner then concludes that its method of accounting clearly reflected its income and, therefore, respondent abused his discretion by requiring petitioner, in effect, to report its commission income on a cash basis. Petitioner contends that its method of accounting clearly reflected its income and, therefore, under Boise Cascade Corp. v. United States,530 F.2d 1367 (Ct. Cl. 1976); Artnell Co. v. Commissioner,400 F.2d 981 (7th Cir. 1968), revg. 48 T.C. 411 (1967); and Beacon Publishing Co. v. Commissioner,218 F.2d 697 (10th Cir. 1955), revg. 21 T.C. 610 (1954), the claim of right doctrine is inapplicable. In all three cases, the courts refused to apply the claim of right doctrine to require an accrual *75 basis taxpayer to account for advance payments in the year of receipt even though the taxpayer received the payments under a claim of right and without restrictions as to use. These cases are readily distinguishable from the instant case. In each of the cited cases, the courts found that the services to be performed and the expenses to be incurred which were attributable to the payment already received were to be performed or incurred in the year following receipt of the payment. In order to more clearly reflect income, the courts allowed the taxpayers to defer inclusion of the payment until such following year. In the instant case, the services to be performed by petitioner were performed completely within its 1981 fiscal year. Moreover, all expenses incident to performance were incurred by petitioner completely within its 1981 fiscal year. [12] Thus, the facts of the instant case more closely resemble those present in Estate of Whitaker v. Commissioner, supra, where all stud services were performed and all expenses incurred within the year the stud fees were received. At the end of such year, all that remained was a contingent liability that, if the resulting *76 foal was not born alive, the stud fees would have to be refunded. *77 There are numerous cases in which the claim of right doctrine was applied regardless of whether the taxpayer accounted for his income on an accrual basis. E.g., North American Oil Consolidated v. Burnet,286 U.S. 417 (1932); Automobile Club of Michigan v. Commissioner,353 U.S. 180 (1957); Bates Motor Transport Lines, Inc. v. Commissioner,200 F.2d 20 (7th Cir. 1952), affg. 17 T.C. 151 (1951); Estate of Whitaker v. Commissioner, supra.
Petitioner's primary duties under the broker-dealer arrangement, as it existed at the end of petitioner's 1981 fiscal year, were to locate suitable investors interested in purchasing units in the partnership, assist those investors in completing the necessary subscription documents, and forwarding the subscription packets to Ramco. Petitioner performed each and every one of these duties by June 30, 1981, well before the close of its 1981 fiscal year. Petitioner performed none of these services after the close of its 1981 fiscal year. Furthermore, petitioner did not perform any other significant duties with respect to the partnership offering after the close of its *78 1981 fiscal year. Petitioner may have attempted, after the close of its 1981 fiscal year, to reassure investors that the equity loan would soon be funded. However, these attempts were undertaken by petitioner upon its own initiative and certainly were not contemplated under the parties' original broker-dealer arrangement (or the amended broker-dealer agreement, for that matter). All that remained at the end of petitioner's 1981 fiscal year was a possible contingent liability that, if the partnership did not survive "birth," the commission fees might have to be refunded. It is well settled that such a contingent liability to make refunds in the year following receipt is not deductible in the year of receipt. Brown v. Helvering,291 U.S. 193 (1934); Security Flour Mills Co. v. Commissioner,321 U.S. 281 (1944); Estate of Whitaker v. Commissioner, supra at 382. We conclude that it is not necessary to defer the inclusion of the commissions in petitioner's income until its fiscal year 1982 to clearly reflect its income but in fact the inclusion of the commissions in petitioner's gross income for its 1981 fiscal year more clearly reflected *79 petitioner's income for Federal income tax purposes. Our conclusion is consistent with that reached by the Supreme Court in American Automobile Association v. United States,367 U.S. 687 (1961), and Schlude v. Commissioner,372 U.S. 128 (1963). In both such cases, an accrual basis taxpayer received advanced payment for services which were to be performed at indefinite times within the year (or years) following receipt. In both such cases, it was possible that, as in the instant case, no services would be performed in the year following receipt. The Court found that, under these circumstances, any method of accounting which attempted to allocate prepaid income to such indefinite performance was purely artificial and did not clearly reflect income for Federal income tax purposes (even though such method might be perfectly acceptable under generally accepted commercial accounting principles). American Automobile Association v. United States, supra at 693-694; Schlude v. Commissioner, supra at 605. Similarly, in the instant case, any method of accounting which attempts to defer inclusion beyond petitioner's 1981 fiscal year, *80 to a year in which petitioner was not definitely required to perform any related services, is purely artificial and does not clearly reflect income for Federal income tax purposes. Petitioner received commission income in its 1981 fiscal year under a claim of right and without restrictions on the disposition of such income. Therefore, petitioner must include the income in its gross income for its 1981 fiscal year. Respondent concedes that, if this Court includes the commission income in petitioner's 1981 fiscal year because the income accrued in that year, petitioner should also be allowed to deduct commissions paid to third party brokers in such year since these commissions became due and payable. However, if we include the commission income in petitioner's 1981 fiscal year income under the claim of right doctrine, respondent contends that the deductions for third party broker commissions are not properly accruable in petitioner's 1981 fiscal year. Since we have decided the first issue on the basis of the claim of right doctrine, we are now faced with the question of whether petitioner's commission expense was properly accruable in its 1981 fiscal year and this in turn involves *81 whether petitioner's commission income was properly accruable in such fiscal year. [13]
Section 1.461-1(a) Income Tax Regs. provides, in part: Under an accrual method of accounting, income is includible in gross income when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. Therefore, under such a method of accounting if, in the case of compensation for services, no determination can be made as to the right to such compensation or the amount thereof until *82 the services are completed, the amount of compensation is ordinarily income for the taxable year in which the determination can be made. * * * Petitioner's contention with respect to the inclusion of the commission income in its 1981 fiscal year is that all events necessary to fix its right to receive the commission income did not occur until after the equity loan had been fully funded and that this funding took place well after the close of its 1981 fiscal year. However, petitioner in the alternative contends that if we decide this issue contrary to its contentions, it is entitled to deduct the amounts due to third party brokers. The broker-dealer arrangement between petitioner and Ramco, which was in effect at the close of petitioner's 1981 fiscal year and which was embodied in the April 24, 1981 letter agreement, does not support its position with respect to the equity loan funding. [14]
*83 The letter agreement provides that petitioner will be entitled to cash commissions up to 8 percent of the subscriptions sold by petitioner and accepted by Ramco, provided that a minimum in $ 1.65 million in subscriptions are accepted by Ramco. It is undisputed that petitioner sold more than enough subscriptions to meet this minimum funding provision by June 30, 1981. The agreement further states that each commission is due within five business days after Ramco receives the subscription payments and that no such commission will be payable until the subscription payments are received and accepted by Ramco. It is undisputed that Ramco received more than enough subscription payments to meet the minimum funding standard and accept them by July 15, 1981. Under the amended certificate of limited partnership, the subscription agreements submitted by investors, and the partnership offering documents, Ramco was given absolute discretion whether to accept or reject the subscriptions of potential investors. Although the record is not clear whether a subscription agreement was accepted when signed by Ramco as general partner or only when it had been so signed and an amended certificate naming *84 the investor as a limited partner had been filed with the Secretary of State of Oklahoma, the general partner of the partnership had completed both tasks prior to the close of petitioner's 1981 fiscal year. The subscription agreements were signed on June 30, 1981 and the amended certificate of limited partnership was filed on July 15, 1981. No further subscribers could be accepted as partners after the filing of the amended certificate. Thus, Ramco, exercising the discretion granted to it under the offering documents, completed the final act which fixed petitioner's right to its commission income under the broker-dealer arrangement within petitioner's 1981 fiscal year. Under the facts here present there is no merit to petitioner's contention that Ramco's acceptance of the subscription agreements and activation of the partnership prior to the close of petitioner's 1981 fiscal year was invalid. In our view, all events (sales by petitioner, receipt by Ramco, acceptance by Ramco) which fixed petitioner's right to payment under the broker-dealer arrangement occurred prior to August 31, 1981. Therefore, the commission income was properly accruable in petitioner's 1981 fiscal year. Consequently, *85 petitioner is also entitled to deduct the payments due to third party brokers within its 1981 fiscal year. Petitioner next contends that, under Rev. Proc. 71-21, 1971-2 C.B. 549, it is entitled to defer inclusion of all or a portion of the commission income until its fiscal year which ended on August 31, 1982 because it had not earned any of its commissions until the equity loan had been funded in such year or that, in the alternative, it performed its most valuable services in its 1982 fiscal year. Rev. Proc. 71-21 provides, in part: An accrual method taxpayer who, pursuant to an agreement (written or otherwise), receives a payment in one taxable year for services, where all of the services under such agreement are required by the agreement as it exists at the end of the taxable year of receipt to be performed by him before the end of the next succeeding taxable year, may include such payment in gross income as earned through the performance of services * * * Petitioner's contention fails for several reasons. First, as noted previously, petitioner performed the services for which it was to be compensated completely within its 1981 fiscal year. Under *86 the broker-dealer arrangement, petitioner was to supply the partnership with willing subscribers who were acceptable to the general partner and who would invest, in the aggregate, at least $ 1,650,000 in the partnership. Under such arrangement, these services had to be performed, at the latest, by June 30, 1981, the date on which the offering closed. No new investors could be accepted as partners after the filing of the amended partnership agreement which took place on July 15, 1981. Thus, no services for which petitioner was compensated, were performed after June 30, 1981, and certainly could not have been performed after July 15, 1981, which was prior to the close of petitioner's 1981 taxable year. Even if we were to assume that the October 29 amendment somehow obligated petitioner to perform further services (i.e., insuring that investors did not attempt to rescind their subscriptions) in its 1982 fiscal year and that this amendment somehow changed petitioner's entitlement to the commissions, the amendment was not entered into until after the close of petitioner's 1981 fiscal year. Although the parties to the amendment provided for an effective date of April 24, 1981, this cannot *87 change the fact that the amendment was not executed until after August 31, 1981. Under the broker-dealer arrangement, as it existed at the end of the taxable year in which petitioner received payment, all services were to be performed by petitioner within the taxable year in which it received payment. Even if we were to accept petitioner's contention that the broker-dealer agreement, as it existed at the end of petitioner's 1981 fiscal year, required it to perform services in its 1982 fiscal year, there was nothing in the agreement to insure that such services would be completed by the end of petitioner's 1982 fiscal year. Rev. Proc. 71-21 specifically states that the taxpayer must include payments in gross income when received if, under the terms of the agreement as it existed at the end of the taxable year of receipt, a portion of the services could be performed after the end of the taxable following the year of receipt. In this case, under petitioner's contention that it was required to perform services until the equity loan was finally funded, it would be required to show that this equity loan would be funded by the end of petitioner's 1982 fiscal year. This has *88 not been shown. Therefore, Rev. Proc. 71-21 does not relieve petitioner from including the commission payment in its gross income in fiscal year 1981, the year in which the payment was received. The last issue is whether petitioner validly elected to relinquish its right to carry back the net operating loss sustained in its 1982 fiscal year and, if it did so, whether petitioner should be relieved from what would otherwise be an irrevocable election because such election was made under a mistake of fact as to the magnitude of its 1982 net operating loss. Section 172(b)(3)(C)[15] provides taxpayers with the opportunity to irrevocably relinquish the carryback period to which they are normally entitled and, instead, carry their net operating losses forward only. The irrevocable election to relinquish the carryback period must be made in the manner prescribed by the Secretary and must be made by the due date (including extensions) of the return for the year in which the loss is sustained. Sec. 172(b)(3)(C). Temporary Income Tax Regs. section 7.0(d) (T.D. 7459), 1977-1 C.B. 590, 42 Fed. Reg. 1469 (Jan. 7, 1977), provides the manner *89 in which the election under section 172(b)(3)(E) [now section 172(b)(3)(C)] must be made: (d) Manner of making election. Unless otherwise provided in the return or in a form accompanying a return for the taxable year, the elections described * * * shall be made by a statement attached to the return (or amended return) for the taxable year. The statement required when making an election pursuant to this section shall indicate the section under which the election is being made and shall set forth information to identify the election, the period for which it applies, and the taxpayer's basis for entitlement for making the election. *90 In Young v. Commissioner,783 F.2d 1201 (5th Cir. 1986), affg. 83 T.C. 831 (1984), the taxpayers sustained a net operating loss in 1976. In their 1976 Federal income tax return, the taxpayers reported their 1976 taxable income as "None," and, on Form 4625, Computation of Minimum Tax, entered on Line 11 the amount of their 1976 loss as a net operating loss carryover to 1977. In rejecting the taxpayer's argument that they had made a valid election to relinquish their carryback period under the above-cited regulation, the Fifth Circuit pointed out that: nothing about the [Line 11] entry indicated their intent to forego the carryback period, and they remained free to file an amended return redistributing their net operating loss over previous years. The Line 11 entry simply did not signify an "election" at all, much less literal compliance with the regulation. Young v. Commissioner, supra at 1204. The court then noted that Congress, by providing an irrevocable election to relinquish the carryback period, intended that the taxpayer assume the risk that a carryback later prove preferable to an immediate carry forward. *91 Therefore, the essence of the statute is that, "a taxpayer unequivocally communicates his election and binds himself to his decision concerning the best use of his net operating loss." Young v. Commissioner, supra at 1205. In our case, unlike Young, we have an unequivocal communication by petitioner that it wished to relinquish any carryback of its net operating loss. Moreover, petitioner does not, and could not, contend that the handwritten statement which was attached to its fiscal year 1982 return fails to satisfy the literal requirements of section 172(b)(3)(C) or section 7.0, Temp. Income Tax Regs. Petitioner's fiscal year 1982 return, to which the election statement is attached, was validly executed by petitioner's president, Mr. Carlstedt, and was filed by May 16, 1983, the extended due date of the return. The attached statement indicates that an election is being made pursuant to section 172(b) to relinquish the entire carryback with respect to the current (1982) net operating loss. However, petitioner does argue that, because Mr. Carlstedt never separately signed the election in the blank space which Mr. Hanna admittedly provided *92 in "an excess of caution," the election to relinquish the carryback period was invalid. We disagree. Neither section 172(b)(3)(C) nor the regulations require that the election statement relinquishing the net operating loss carryback be signed separately. Congress has charged the Secretary, as it often has done in the past, with the task of determining the manner in which this particular election must be made. Whenever the Secretary has required that an election under a particular Code section be separately signed and executed, he has done so explicitly in the regulations. See, for example, sec. 1.121-4(b), Income Tax Regs. (election under sec. 121(c) by individual who has attained the age of 55 to exclude from gross income gain from sale of principal residence must be signed by individual); sec. 1.545-3(e), Income Tax Regs. (election under sec. 545(c) not to deduct amounts irrevocably set aside to pay qualified indebtedness in computing undistributed personal holding company income must be separately signed if Form PH is not filed with return); sec. 18.1362-2(a), Income Tax Regs. (election under sec. *93 1362(a) to be treated as small business corporation must be made on Form 2553 or on separate statement signed by each shareholder). The Secretary has chosen not to require that the election statement under sec. 172(b)(3)(E) be separately signed and we do not consider it proper to superimpose such a requirement. We note that, if the parties' positions were reversed, respondent would be hard-pressed to convince us that petitioner had not made a valid election to relinquish its carryback period because the election was not executed separately from the return to which it was attached. Where as here, there is an unequivocal statement by petitioner filed with the return which meets the literal requirements of the regulation, we cannot disregard that statement merely because it has not been signed. Petitioner contends that we should disregard the election statement because the president of petitioner, Mr. Carlstedt, was unaware of the election and never intended to relinquish petitioner's carryback. This, according to petitioner, is the reason why Mr. Carlstedt never separately signed the election statement. However, the record does not support petitioner's contention. Petitioner's *94 accountant, Mr. Hanna, testified that he spoke with Mr. Carlstedt about the relinquishment after preparing petitioner's return. Mr. Hanna suggested to Mr. Carlstedt that it would be better, from a tax-planning point of view, to carry the loss forward, instead of back, since the corporation was expected to have taxable income in its fiscal year 1983. There is no indication in Mr. Hanna's testimony that Mr. Carlstedt questioned his judgment in this respect. Furthermore, Mr. Carlstedt testified he reviewed petitioner's returns before signing and submitting them to the Internal Revenue Service. Surely, during such review, he would have noticed the election statement and, if he no longer intended that petitioner relinquish its carryback, would have brought the matter to the attention of Mr. Hanna or removed the election statement himself. However, Mr. Carlstedt did neither. Nor did he question Mr. Hanna about the 1982 net operating loss when it was subsequently utilized on petitioner's fiscal year 1983 return. We realize that Mr. Carlstedt testified that he would never have agreed to the relinquishment and given up the opportunity to carry back substantial losses. However, Mr. *95 Carlstedt does not contend that at the time he filed petitioner's 1982 return he knew that respondent would successfully challenge petitioner's deferral (to fiscal year 1982) of the $ 420,000 in commission income. Thus, at the time its fiscal year 1982 return was filed, petitioner's loss was an insubstantial $ 168.95. In any event, the intent of petitioner's president or its accountant is irrelevant to the determination of whether a valid and binding election was made under section 172(b)(3)(C). As the Fifth Circuit stated in Young v. Commissioner, supra at 1206: But nineteen bishops swearing as to the taxpayers' subjective intent would not carry this argument, because it contends for an irrelevant fact. The Commissioner did not have access to the taxpayers' workpapers and was not otherwise informed of their state of mind. * * * Similarly, in this case, respondent could not have known whether petitioner's president had second thoughts about the election prior to filing its return. Consequently, respondent had no reason not to conduct himself as if the election statement was, indeed, valid. Petitioner's final argument is that it should be relieved from the *96 effects of an election which, it contends, was made under a mistake of fact. According to petitioner, Mr. Carlstedt, its president, misunderstood the broker-dealer arrangement. He believed that petitioner was not entitled to payment until the equity loan had been funded in fiscal year 1982. Petitioner contends that these misapprehensions caused it to include the commissions in its income for fiscal year 1982 and, thereby, misjudge the true extent of its 1982 operating loss. From this petitioner concludes it should be allowed to carry back its increased 1982 loss before carrying it forward. Petitioner's final argument is without merit. Regardless of the misunderstandings petitioner's president may have labored under in 1981, by the time petitioner filed its fiscal year 1982 return on May 16, 1983, all of the facts surrounding the transaction had been irrevocably fixed. Furthermore, petitioner's president was well aware of these facts. He had the offering documents in hand. He knew that he had received payment within his 1981 fiscal year. He realized that the equity loan had not been funded. He knew that the equity loan was finally funded on December 4, 1981. The only misunderstandings *97 that persisted at the time petitioner filed its return was the construction to be placed on the parties' contracts and the effects this construction might have on whether the commission payment should be included in fiscal year 1981 or fiscal year 1982. In other words, petitioner and its president simply misapplied the law to a fixed set of known facts. It was this misapplication of contract and Federal income tax law which caused petitioner to misjudge the extent of its fiscal year 1982 losses and elect the benefits of section 172(b)(3)(c). Under such circumstances, petitioner should not be allowed to undo an irrevocable election simply because the election later turned out to be not so beneficial. The case of Meyer's Estate v. Commissioner,200 F.2d 592 (5th Cir. 1952), revg. 15 T.C. 850 (1950), is distinguishable. There the court's decision to allow the taxpayers to escape the effects of an election under section 333 was based almost entirely on a stipulation by the parties that the taxpayers had relied, in good faith, on an erroneous estimation of their corporation's earnings and profits. The court thought it unreasonable to assume that *98 the taxpayers relied upon the existence of a small earned surplus yet had knowledge or independent recollection of the true larger earned surplus. Thus, the court concluded that the taxpayers would never have made the election but for the stipulated mistake of fact. Meyer's Estate v. Commissioner, supra at 597. In contrast, the parties to this case have made no such stipulation. Rather, the error in this case relates solely to the improper deferral by an accrual basis taxpayer of a payment received under a claim of right and without restriction as to use. This is quite obviously a mistake of law. Therefore, the mistakes made in the present case more closely resemble those made in Bankers & Farmers Life Ins. Co. v. Commissioner,643 F.2d 234 (5th Cir. 1981). In that case, an insurance company's accountant determined that prudent tax planning called for the company to elect, in accordance with section 815(b)(1), to recognize income in order to take advantage of an expiring net operating loss from 1965 and substantial net operating losses from later years. The president of the company filed a handwritten election statement with the company's *99 return. It was later determined that the accountant had erred in deciding to expense, rather than amortize, certain purchases of insurance contract blocs, that this mistake caused the accountant to overestimate the amount of loss carryover generated in 1965 and later years, and that the accountant erroneously concluded that the income recognized as a result of the section 815(b)(1) election could properly be offset with these losses. The Fifth Circuit distinguished Meyer's Estate v. Commissioner, supra, on the same basis that we have (i.e., the parties in Meyer's Estate stipulated to a mistake of fact) and concluded that the election was inspired wholly by mistakes of law. In our view there is no distinction between the present case and Bankers & Farmers Life Ins. Co. v. Commissioner, supra.In both cases, a legal judgement concerning the Federal income tax effects of a known set of facts caused the taxpayer to make an imprudent election. However, an unfortunate legal judgment does not entitle petitioner to rescind an otherwise valid election. Bankers & Farmers Life Ins. Co. v. Commissioner, supra at 238. We conclude that *100 petitioner is not entitled to the carryback period he chose to forego. [16] Petitioner must include the commissions in income in the year of receipt, fiscal year 1981. However, petitioner is entitled to deduct the commissions due to third party brokers in fiscal year 1981. In view of the foregoing, Decision will be entered under Rule 155.
Footnotes
1. As will be discussed later in the opinion, Penn Square was not the lender of the equity loan and was, in fact, the issuer of the letters of credit. It is unclear why Penn Square would be the named beneficiary of a letter of credit it had issued.↩
2. The parties have stipulated that the petitioner sold 99.3 units by June 30, 1981, the end of the subscription period. However, the subscription documents in evidence indicate that as many as 102.5 partnership units were eventually sold to a total of 45 investors. The parties have also stipulated that petitioner treated $ 420,000 as a commission advance from the sale of units in the partnership. If this commission figure is accepted, petitioner must have received an 8-percent commission on the sale of at least 105 partnership units ([8-percent divided by $ 420,000] divided by $ 50,000).↩
3. The parties had originally stipulated that petitioner paid out a total $ 222,969.23 in third party broker commissions in connection with the Ramco offering. A photocopy of each commission check was entered into the record as a joint exhibit. In addition, petitioner's books of account display seven entries, totaling $ 222,969.23, under "commissions paid." However, at trial, Mr. Carlstedt testified that one of the checks, which had been issued to a Mr. Joseph Valenti, had been paid out in connection with an entirely different offering and, therefore, was not properly attributable to the Ramco offering. Although we will not lightly disregard a stipulated fact, where such fact is clearly contrary to facts disclosed by the record, we refuse to be bound by the stipulation. Jasionowski v. Commissioner,66 T.C. 312 (1976). Since Mr. Carlstedt's uncontradicted testimony shows that Mr. Valenti took no part in the Ramco offering and the photocopy of the check itself is virtually illegible, we do not consider the Valenti third party commission check to be properly attributable to the Ramco offering. In a similar vein, respondent questions the origin of another third party commission check for $ 90,000, even though the check was included in the total amount stipulated to by the parties, because the photocopy of the check in evidence is also illegible. Respondent thus claims that petitioner has not substantiated that this $ 90,000 is actually attributable to the Ramco offering. We have previously stated that we will disregard a stipulated fact only if it is clearly contradicted by other facts appearing in the record. Mr. Carlstedt never questioned the connection of the $ 90,000 commission check to the Ramco offering. He was only unsure about the Valenti check. Nor did respondent question the inclusion of the $ 90,000 check at trial and, thus, give petitioner the opportunity to present a clearer photocopy or other substantiating evidence before the record closed. Under these circumstances, we will adhere to the facts stipulated to by the parties and will treat the $ 90,000 third party commission check as properly attributable to the Ramco offering.↩
4. Both petitioner's 1981 audited financial statement and its 1981 return disclose that, as of August 31, 1981, petitioner had loaned its sole shareholder, Mr. Carlstedt, over $ 200,000. However, the specific amount of such shareholder advances shown on petitioner's return differs from the amount shown on its audited financial statement. Petitioner's FOCUS report for the period ending August 31, 1981 discloses no such advances to Mr. Carlstedt.↩
5. All section references are to the Internal Revenue Code of 1954, as in effect during the years here in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
6. We express no opinion as to whether petitioner has properly assessed the potential application of sec. 12(2) of the Securities Act of 1933.↩
7. We note that, unlike Healy v. Commissioner,345 U.S. 278 (1953), the factual scenario under which petitioner might be forced to repay the funds it had received had not even matured by the end of the year at issue. In Healy v. Commissioner, supra, the corporation had already paid the excessive salaries. All that remained was for the Commissioner to disallow the salaries as excessive under the applicable statute and charge the taxpayers with transferee liability under the applicable statute. In this case, the partnership had not given up in its attempts to fund the equity loan. All the facts which petitioner contends would entitle the investors to rescission under the applicable statute were not yet "present." At the end of petitioner's fiscal year 1981, it was not clear that any legal restriction would arise and, thus, our facts present an even stronger case for application of the claim of right doctrine than the Healy↩ case. 8. Petitioner also points out that a willful misstatement or omission of a material fact in connection with a securities offering could result in the imposition of criminal sanctions. However, we discount the possibility that petitioner would ever be subject to criminal sanctions because we consider it clear that the partnership always intended to obtain financing and, therefore, there would be no willful misstatement even if the equity loan was never obtained. Furthermore, even if petitioner had willfully misstated material facts in order to induce investors to subscribe, we consider it clear, in light of the Supreme Court's decision in James v. United States,366 U.S. 213↩ (1961) (embezzler must include embezzled funds in income under claim of right doctrine even though his claim to funds was not bona fide and he was, at all times after embezzlement, under an unqualified duty to return embezzled funds), that petitioner would still be forced to include the commission payment in its income upon receipt.
9. The Eleventh Circuit, to which an appeal in this case would lie, has announced that it will consider, as binding precedent, all decisions of the Fifth Circuit rendered prior to the close of business on Sept. 30, 1981. Bonner v. City of Prichard,661 F.2d 1206↩ (11th Cir. 1981)
10. $ 28,000 ($ 420,000 in aggregate indebtedness which petitioner disclosed on its FOCUS report multiplied by six and two-thirds percent) less $ 5,000 (the minimum net capital petitioner was required to maintain regardless of the amount of aggregate indebtedness shown on its FOCUS report) results in an additional capital requirement of $ 23,000. This amount is without a deduction for the $ 8,911 difference in the commissions received by petitioner and the $ 411,009 in deductions shown on its FOCUS report.↩
11. Petitioner's claim that, in effect, the commission payment was a loan from Ramco is without merit. The debt was not evidenced by a note, petitioner's obligation to repay was only contingent, and petitioner (as opposed to the partnership) was not required to pay interest on the amount purportedly loaned. Under such circumstances, we refuse to fabricate the existence of a debtor-creditor relationship merely to satisfy petitioner's desire that the commission be treated as a liability for Federal income tax purposes.↩
12. The facts show that petitioner paid commissions owed to third party brokers in connection with the offering in the year following receipt of its commission. However, petitioner's president, Mr. Carlstedt, testified that he believed that these commissions became due and payable at the same time petitioner's commissions were due and payable. Thus, if petitioner earned its commissions by performing all services within its 1981 fiscal year, the third party broker commissions would also be earned and thus properly attributable to petitioner's 1981 fiscal year. To condition inclusion or deferral on when petitioner paid these third party brokers would simply beg the question presented by this case (i.e., when should petitioner include the commissions in income). Furthermore, Mr. Carlstedt testified that the only reason he deducted these commissions in petitioner's 1982 fiscal year, rather than its 1981 fiscal year, was because the commissions were not actually paid out until petitioner's 1982 fiscal year. After the Court reminded him that petitioner was an accrual basis taxpayer, Mr. Carlstedt testified that third party broker expenses were deducted in petitioner's 1982 fiscal year because they were not accrued until such year.↩
13. Section 1.461-1(a)(2), Income Tax Regs. provides in part: Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. * * * Respondent concedes that the sole event necessary to definitely fix petitioner's liability to pay the third party broker commissions is the accrual of petitioner's commission income. Thus, in deciding this issue, we will speak in terms of income accrual rather than deduction accrual.↩
14. Petitioner makes much of the fact that this letter agreement was never executed by Mr. Carlstedt on behalf of petitioner. Petitioner requests that we disregard a stipulation, to which it agreed, that the April 24, 1981 letter agreement constituted the contractual arrangement of the parties. We will not disregard this stipulated fact but consider it consistent with the other evidence of record.↩
15. Section 172(b)(3)(C) provides: (C) Any taxpayer entitled to a carryback period under paragraph (1) may elect to relinquish the entire carryback period with respect to a net operating loss for any taxable year ending after December 31, 1975. Such election shall be made in such manner as may be prescribed by the Secretary, and shall be made by the due date (including extensions of time) for filing the taxpayer's return for the taxable year of the net operating loss for which the election is to be in effect. Such election, once made for any taxable year, shall be irrevocable for that taxable year.↩
16. In its petition, petitioner in the alternative alleges that section 7.0(d), Temporary Income Tax Regs., 42 Fed. Reg. 1469 (Jan. 7, 1977), is invalid. Petitioner does not discuss this contention in its brief and we assume has abandoned it. In any event, we have accepted these regulations as valid. Young v. Commissioner,83 T.C. 831 (1984), affd. 783 F.2d 1201↩ (5th Cir. 1986).