CONTINENTAL ILLINOIS CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Continental Illinois Corp. v. Commissioner
Docket No. 5931-83
United States Tax Court
T.C. Memo 1989-636; 1989 Tax Ct. Memo LEXIS 636; 58 T.C.M. (CCH) 790; T.C.M. (RIA) 89636; November 28, 1989
*636 CINB, a bank wholly owned by petitioner, extended loans to borrowers pursuant to loan agreements which provided an interest rate cap, but called for interest payments at a floating rate which was tied to CINB's prime rate. Under certain conditions, borrowers were entitled at maturity of their loans to repayment of interest to the extent that payments made at the floating rate exceeded payments which would have been made at the cap rate. The amount of interest which was subject to repayment by CINB was not included as income on the consolidated returns that petitioner filed for the years in issue. Held: Respondent's determination under section 446(b) is sustained, and interest income must be accrued on such loans at the floating rate at which borrowers made interest payments. Held further: Respondent's determination under section 481, relating to adjustments required by changes in accounting method, is sustained. Edward C. Rustigan, Joel V. Williamson, Roger J. Jones, and Lloyd S. Fischer, for the petitioner. Beth L. Williams, Robert A. Bedore, Cynthia J. Mattson, and Grace L. Perez-Navarro, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: *637 By statutory notice dated December 20, 1982, respondent determined deficiencies in the Federal income tax of petitioner, Continental Illinois Corporation (Continental Illinois), and the affiliated corporations with which it filed consolidated returns, including Continental Illinois National Bank and Trust Company of Chicago (CINB), as follows: Year
Deficiency
1975
$ 1,899,880 1976
84,088
1977
36,741,206
1978
15,844,349
Pursuant to joint motion, the Brazilian foreign tax credit issue was severed from the other issues, consolidated with another case, and tried at a special trial session in Washington, D.C. See Continental Illinois Corp. v. Commissioner, T.C. Memo. 1988-318. By order dated April 12, 1989, the issue known as the "Iranian Loss" issue was severed from the remaining issues in the case. [1] Those remaining issues known as the "CAP Loan" issue and the "Net Loan" issue, which involve only the years 1977 through 1979, were tried at a special trial session that commenced in Washington, D.C., on May 8, 1989. As a preliminary matter, certain evidentiary issues which arose in connection with the "Net Loan" issue were resolved pursuant to Continental Illinois Corp. v. Commissioner, T.C. Memo. 1989-468. *638 This opinion covers only the "CAP Loan" issue; the remaining "Net Loan" issue will be the subject of a later opinion. The primary issue to be resolved with respect to the CAP Loans is whether respondent abused his discretion under section 446(b)[2] by determining that CINB's income tax accounting method, which was in conformity with its financial and regulatory accounting method, did not clearly reflect interest income with respect to such loans. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulations and exhibits attached thereto are incorporated herein by reference except as otherwise provided in the order which was issued in conjunction with our opinion resolving the evidentiary issues. Continental Illinois is a Delaware corporation which had its corporate headquarters in Chicago, Illinois, at the time it filed its petition herein. Continental Illinois maintains its books and files its tax returns on an accrual basis. Continental *639 Illinois and a group of affiliated corporations filed consolidated Federal income tax returns for each of the relevant calendar years. Included in that group is CINB, a Federally incorporated national banking association wholly owned by Continental Illinois. CINB made the CAP Loans which are the subject of this opinion. Beginning in 1972 and continuing for more than a decade thereafter, CINB made loans known in banking parlance as "CAP Loans" to certain creditworthy corporate borrowers. CINB had CAP Loans outstanding to 61 borrowers during the years in issue. CINB was the sole or lead lending bank with respect to most of those CAP Loans and a participating lending bank with respect to the rest. With the exception of one revolving credit loan, the CAP Loans at issue were loans CINB made for specified terms, typically ranging from 5 to 10 years. CINB made CAP Loans pursuant to agreements which called for the payment of interest at a floating rate determined as either a percentage of CINB's prime rate (e.g., 120 percent of prime) or an interest point spread above CINB's prime rate (e.g., prime plus 2 percent). CINB's prime rate was the publicly announced rate of interest which CINB *640 offered at Chicago for 90-day unsecured commercial loans to large corporate customers of the highest credit standing. [3] The prime interest rate, and thus the floating interest rate, changed numerous times during the years in issue. According to the CAP Loan agreements, if certain conditions were satisfied, borrowers were entitled at or after maturity to any excess interest paid to CINB over the term of the loans. The amount of excess interest, [4] *641 if any, to be repaid to a borrower by CINB was determined by comparing the total amount of the actual interest payments made by such borrower over the term of the loan with the total amount of interest payments which would have been made by such borrower at the agreed upon CAP rate over the term of the loan. The CAP rate was a fixed percentage rate (e.g., 8 percent) which did not change after it was agreed upon by the parties to a CAP Loan agreement. [5] The CAP Loan agreements called for borrowers to make interest payments at the floating rate either monthly, quarterly, or semi-annually. Those agreements also called for a comparative computation of interest at the CAP rate on the average principal balance outstanding at various intervals, including interest due dates, dates of any prepayment or default, and loan maturity dates. Such computations were used to determine whether payment of interest at the floating rate resulted in an excess or shortfall of interest for the particular period. A floating rate above the CAP rate resulted in excess interest and a CAP rate above the floating rate resulted in an interest shortfall. Shortfall situations occurred rarely, and with respect to some CAP Loans not at all, because interest rates during the years in which CINB had CAP Loans outstanding generally followed an upward trend. The overall increase in interest rates usually kept floating rates above CAP rates, *642 which remained fixed at previously agreed upon levels. For a CAP Loan with respect to which the floating rate exceeded the CAP rate, CINB accrued interest income for financial and regulatory purposes at the CAP rate and credited the excess interest to a liability account identified by it as "Interest Collected But Not Earned" (an Excess Interest account). For a CAP Loan with respect to which the CAP rate exceeded the floating rate, i.e., a shortfall situation, the amount of interest income accrued by CINB depended on the extent, if any, to which the particular borrower had previously made excess interest payments. In such a situation, CINB accrued interest income at the CAP rate, but only if and to the extent that there was excess interest available to cover the shortfall. To the extent that excess interest was not available to cover the shortfall, CINB accrued interest at the floating rate. When a shortfall was covered with excess interest, CINB made a corresponding reduction in the credit balance of the Excess Interest account established with respect to the particular borrower. CINB enjoyed the use of all interest payments made by CAP Loan borrowers, including excess interest *643 payments. CINB's use of such payments was subject only to the general financial and regulatory requirement that sufficient overall assets be maintained to meet its liabilities, including its obligation to repay excess interest to CAP Loan borrowers if certain conditions were satisfied. CINB commingled CAP Loan interest payments with its other funds and used such payments for various purposes permitted by the financial and regulatory authority under which it operated. Such uses included the earning of income, payment of expenses and liabilities, and investment. CINB did not pay borrowers interest on the credit balances reflected in Excess Interest accounts regardless of whether the excess interest was eventually repaid to borrowers or retained because borrowers failed to satisfy the conditions for repayment set forth in the CAP Loan agreements. Generally two conditions had to be satisfied in order for a borrower to be entitled to receive repayment of excess interest from CINB: [6] (1) no prepayment of principal; and (2) no default. CINB was required to repay the cumulative amount of excess interest, as reduced by shortfalls, to any borrower that satisfied both of those conditions. *644 Repayment was generally made when the loan matured or shortly thereafter. Sometimes CINB repaid the excess interest to a borrower by applying it to the borrower's final payment of interest and principal or by crediting it to an account of the borrower. CINB reflected repayment of excess interest on its books by debiting Excess Interest accounts as appropriate. When a borrower failed to satisfy the conditions entitling it to repayment of excess interest, CINB accrued income in an amount equal to the amount of such excess interest. CINB reflected accrual of such income on its books by crediting a miscellaneous income account and debiting the Excess *645 Interest account of the borrower determined not to be entitled to repayment of excess interest. In certain instances, CINB waived the conditions and repaid excess interest, or a portion thereof, to borrowers not otherwise entitled to repayment under the terms of the CAP Loan agreements. When CINB repaid only a portion of excess interest it presumably accrued the remainder as income after reaching an agreement with the borrower regarding the disposition of such excess interest. Although the condition prohibiting prepayment was waived on a number of occasions to avoid jeopardizing relationships with particular borrowers, CINB never indicated to borrowers that it did not intend to enforce that condition. During the years 1973 through 1987, CINB debited Excess Interest accounts established with respect to CAP Loans outstanding at any time prior to 1980 in amounts totaling $ 127,053,972. Those debits reflected repayments of excess interest to borrowers in the amount of $ 114,216,357, shortfalls in the amount of $ 2,753,401 which were covered by excess interest, miscellaneous income (i.e., excess interest retained by CINB) in the amount of $ 4,993,475, corrections of errors in the amount *646 of $ 4,965,632, and $ 125,107 of debits the reasons for which are unknown. [7] CINB debited Excess Interest accounts in amounts totaling $ 14,381,389 during the years in issue. That total reflects repayments of excess interest in the amount of $ 11,710,814, shortfalls in the amount of $ 1,026,014 which were covered by excess interest, miscellaneous income in the amount of $ 424,390, corrections of errors in the amount of $ 1,217,514, and $ 2,657 of debits the reasons for which are unknown. The balance in CINB's liability account "Interest Collected But Not Earned," which reflected the total of individual Excess Interest accounts, as of December 31, 1976, 1977, 1978, and 1979, as well as the net increases (decreases) in such account during those years are as follows: Year
Ending Balance
Increase (Decrease)
1976
$ 16,371,168
--
1977
11,577,062  ($ 4,794,106)
1978
14,713,887  3,136,825    1979
26,010,158  11,296,271   With *647 respect to CAP Loans, CINB accrued interest for tax purposes at the same rate and in the same manner which it used for financial and regulatory purposes. Thus, on petitioner's returns for the years in issue, excess interest was neither recognized nor reported as income until CINB determined that it was necessary to cover a shortfall or that it would be retained rather than repaid to a CAP Loan borrower. In his notice of deficiency, respondent determined that CINB's method of reporting interest on CAP Loans did not clearly reflect income and that, in order to do so, interest income must be accrued at the floating rate at which CAP Loan borrowers agreed to make interest payments. Respondent further determined that petitioner was not entitled to deduct repayments of excess interest which CINB anticipated making to CAP Loan borrowers until the fact of repayment became certain and the amount thereof became determinable with reasonable accuracy. [8] Accordingly, respondent increased petitioner's income for 1977 by $ 11,577,062, an amount which reflects the beginning balance of CINB's "Interest Collected But Not Earned" account ($ 16,371,168) as reduced by the decrease in the balance of that *648 account which occurred during the year ($ 4,794,106). For each of the two succeeding years, 1978 and 1979, respondent increased petitioner's income by the amount of the increase in the balance of CINB's "Interest Collected But Not Earned" account which occurred during those years, $ 3,136,825 and $ 11,296,271, respectively. OPINION Section 446(a) provides the general rule that "Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." Under section 446(b), "If * * * the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income." Subject to the requirements of section 446(a) and (b), section 446(c) permits a taxpayer to use the cash method, [9] accrual method, other statutorily permitted methods, or any combination of methods permitted under the regulations. Here, however, respondent *649 determined that CINB's income tax accounting method, which was in conformity with its financial and regulatory accounting method, did not clearly reflect interest income with respect to CAP Loans. Thus, the primary issue raised is whether petitioner has established that respondent abused his discretion in making that determination. A heavy burden is imposed upon petitioner to overcome respondent's determination, because section 446 vests respondent with broad discretion in determining whether a particular method of accounting clearly reflects income. Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532 (1979); United States v. Catto, 384 U.S. 102, 114 (1966); Commissioner v. Hansen, 360 U.S. 446, 467 (1959); Lucas v. Kansas City Structural Steel Co., 281 U.S. 264, 271 (1930); Molsen v. Commissioner, 85 T.C. 485, 498 (1985). [10] However, in exercising his discretion, respondent cannot require *650 CINB to change from an accounting method which clearly reflects income. Prabel v. Commissioner, 91 T.C. 1101, 1112 (1988), affd. 882 F.2d 820 (3d Cir. 1989); Molsen v. Commissioner, supra; Bay State Gas Co. v. Commissioner, 75 T.C. 410, 417, 423 (1980), affd. 689 F.2d 1 (1st Cir. 1982); Auburn Packing Co. v. Commissioner, 60 T.C. 794, 798-800 (1973); Garth v. Commissioner, 56 T.C. 610, 618 (1971). Whether the method used by CINB clearly reflects income is primarily a question of fact. Madison Gas & Electric Co. v. Commissioner, 72 T.C. 521, 555 (1979), affd. 633 F.2d 512 (7th Cir. 1980). But we need not weigh and determine the relative merits of various methods of accounting, United States v. Catto, supra, nor need we decide if, in our own judgment, CINB's method clearly reflects income; rather, we must decide whether there is an adequate basis in law for respondent's determination that CINB's method fails to do so. RCA Corp. v. United States, 664 F.2d 881, 886 (2d Cir. 1981), cert. denied 457 U.S. 1133 (1982). Respondent essentially argues that interest income accrues when the right to receive it becomes fixed, *651 even if later events may require repayment of it. Because CINB had the right under CAP Loan agreements to receive interest payments at the floating rate, respondent further argues that interest, including that portion thereof which was accounted for as excess interest, accrued and was taxable when those payments became due and payable or when such payments were received, whichever was earlier. To the contrary, petitioner argues that CINB should be allowed to defer inclusion of excess interest in income because of its repayment obligation. In support of that argument petitioner alternatively contends that (1) neither the so-called "all events test" nor the claim of right doctrine applies with respect to excess interest, which was subject to a high probability of repayment; (2) excess interest was in the nature of a deposit with, or advance to, CINB rather than an item of gross income; and (3) those cases which forbid the deferral of prepaid income do not require inclusion of excess interest which could only be retained by CINB "upon the happening of specific (albeit improbable) events in subsequent taxable years." Income is included in gross income in the taxable year of receipt *652 unless accounted for in a different period under the taxpayer's method of accounting. Sec. 451(a). The cornerstone of the accrual method of accounting for Federal income tax purposes is the all events test. See, e.g., Brown v. Helvering, 291 U.S. 193 (1934); Lucas v. American Code Co., 280 U.S. 445 (1930); United States v. Anderson, 269 U.S. 422 (1926). The regulations describe the accrual method in the following manner: Generally, under an accrual method, income is to be included for the taxable year when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. Under such a method, deductions are allowable for the taxable year in which all the events have occurred which establish the fact of the liability giving rise to such deduction and the amount thereof can be determined with reasonable accuracy. * * * Sec. 1.446-1(c)(1)(ii), Income Tax Regs. This description of the accrual method is repeated in the regulations under section 451, to the extent that it pertains to the accrual of income, and in the regulations under section 461, to the extent that it pertains to the accrual of expenses. It is *653 well established that a taxpayer who reports his income on the accrual method is subject to tax liability when the right to receive such income becomes fixed, or when the taxpayer has actually received income to which his use is unrestricted. Brown v. Helvering, supra at 199; Automobile Club of New York, Inc. v. Commissioner, 32 T.C. 906, 913 (1959), affd. 304 F.2d 781 (2d Cir. 1962). As the Supreme Court stated in Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 184-185 (1934): Keeping accounts and making returns on the accrual basis, as distinguished from the cash basis, import that it is the right to receive and not the actual receipt that determines the inclusion of the amount of gross income. When the right to receive an amount becomes fixed, the right accrues. * * * [Emphasis in original.] In this case, CAP Loan agreements required borrowers to make interest payments to CINB at specified intervals. Thus, respondent argues, and we agree, that those agreements fixed the time of accrual because there were no conditions precedent to CINB's right to receive interest payments with respect to CAP Loans. Cf. Burnham Corp. v. Commissioner, 90 T.C. 953 (1988), affd. 878 F.2d 86 (2d Cir. 1989). *654 We emphasized the distinction between conditions precedent and subsequent in the accrual of deductions context in Burnham Corp., and held that the existence of a condition subsequent which may cut off liability in the future does not prevent that liability from being fixed for accrual purposes. Likewise, the occurrence of later events which require the repayment of income does not necessarily prevent that income from being fixed for accrual purposes. North American Oil Consolidated v. Burnet, 286 U.S. 417 (1932). When interest at the floating rate was due and payable, or paid, to petitioner, all of the events had occurred which call for the accrual of interest income. Sec. 1.451-1(a), Income Tax Regs. In our view, the obligation to refund excess interest upon satisfaction of the conditions set forth in the CAP Loan agreements constituted a contingent liability which had no bearing on CINB's right to receive interest payments, including that portion of those payments accounted for by CINB as excess interest. Cf. Fourth Financial Corp. v. Commissioner, T.C. Memo. 1985-232. [11] *656 Moreover, CINB received interest payments from CAP Loan borrowers under a claim of right and without restrictions. *655 Thus, we think that an adequate legal basis exists for respondent's determination that the method used by CINB fails to clearly reflect income with respect to CAP Loans. Claim of Right Doctrine Although this Court has not previously applied the claim of right doctrine in this particular context, CINB's receipt of interest payments on CAP Loans exhibits the factual element common to all claim of right doctrine cases, "the receipt of money or other property by a taxpayer with an imperfect right to retain it." Nordberg v. Commissioner, 79 T.C. 655, 664 (1982), affd. without published opinion 720 F.2d 658 (1st Cir. 1983), quoting Wootton, "The Claim of Right Doctrine and Section 1341," 34 Tax Law. 297 (1981). The most frequently cited in a long *657 line of cases which apply the claim of right doctrine is North American Oil Consolidated v. Burnet, supra. In that case, the Supreme Court required the taxpayer to include in gross income for its 1917 taxable year an amount it had received as a result of a favorable judgment even though litigation over the taxpayer's right to such income continued until 1922. The Court explained the doctrine as follows: If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. * * * [Citations omitted.] North American Oil Consolidated v. Burnet,supra at 424. Petitioner argues that application of the claim of right doctrine does not result in a clear reflection of income because the excess interest was repaid to CAP Loan borrowers "almost without exception." Petitioner apparently makes that argument to justify CINB's departure from reporting interest income with respect to CAP Loans on the basis of its annual accounting period. However, under our *658 Federal tax system income must be computed on an annual basis, Healy v. Commissioner, 345 U.S. 278, 281 (1953), and the claim of right doctrine provides a necessary finality to each such annual accounting period. United States v. Lewis, 340 U.S. 590, 592 (1951). Income is not computed on a transactional basis or for a period in excess of a year, except to the extent that Congress has specifically provided, as, for example, in the case of carrybacks and carryforwards. No statutory exception exists for situations such as the one now before us. In order for the claim of right doctrine to apply, two prerequisites must be present at the close of the period within which income is sought to be taxed. North American Oil Consolidated v. Burnet, supra.First, the taxpayer must claim entitlement to the funds at issue. Second, such funds must be held by the taxpayer without restrictions on disposition. In Carlstedt Associates, Inc. v. Commissioner, T.C. Memo. 1989-27, 56 T.C.M. 1090, 1098, 58 P-H Memo T.C. par. 89,027, 89-112, 89-120-89-121, we noted that: If there are no restrictions on the taxpayer's disposition of funds which it holds, yet the taxpayer never claims any entitlement to the *659 funds, the claim of right doctrine may not require inclusion of the funds in income. Conversely, if the taxpayer claims entitlement to funds it has received, but its ability to dispose of the funds as it chooses is substantially restricted, the claim of right doctrine may not require inclusion of the funds in income. * * * [Citation omitted.] Petitioner seeks to avoid application of the claim of right doctrine by arguing that CINB neither claimed entitlement to excess interest nor held the amounts thereof without restrictions on disposition. With respect to CINB's entitlement to excess interest, petitioner contends that CINB never contested "the right of CAP Loan borrowers to retain excess CAP Loan interest payments," that CINB established liability accounts on its books to ensure the availability of funds to repay excess interest, and that CINB repaid "virtually 100 percent" of the excess interest to CAP Loan borrowers. With respect to the restrictions on CINB's disposition of excess interest, petitioner contends that CINB reduced its asset base for lending purposes by recording excess interest as a liability account on its books, that CINB was compelled by regulatory and financial *660 rules to maintain sufficient assets with which to discharge its repayment obligation, and that CINB sustained substantial losses because by virtue of CAP Loan agreements it was making below-market loans. Petitioner further contends that those purported restrictions allowed CINB to enjoy nothing more than the time value of the excess interest, which it considered to be compensation for providing loans with a CAP rate to borrowers. CINB received interest payments, including that portion thereof which was accounted for as excess interest, pursuant to CAP Loan agreements. Those agreements leave no doubt as to CINB's entitlement to the excess interest. The CAP Loan borrowers were liable for interest payments at the floating rate and CINB had the right to demand such payments and presumably would have, had such payments not been timely made. That entitlement is further demonstrated by CINB's use of excess interest for its own purposes. CINB's repayment obligation, which was contingent on there being no shortfalls, prepayments, or defaults with respect to particular CAP Loans, does not change the fact that CINB had a claim of right to excess interest throughout the years in issue. The *661 claim of right doctrine applies "notwithstanding that the taxpayer may be under a contingent obligation to restore the funds at some future point." Professional Insurance Agents of Michigan v. Commissioner, 78 T.C. 246, 270 (1982), affd. 726 F.2d 1097 (6th Cir. 1984). The mere fact that the excess interest received by CINB may have to be returned at a later date did not deprive such excess interest of its character as taxable income when received. Brown v. Helvering, 291 U.S. 193, 199 (1934); Illinois Power Co. v. Commissioner, 792 F.2d 683, 689 (7th Cir. 1986), affg. in part and revg. in part 83 T.C. 842 (1984); Nordberg v. Commissioner, supra at 665; Woolard v. Commissioner, 47 T.C. 274, 279 (1966). If repayment of all or a part of the excess interest is required in a subsequent year, a deduction may then be available in such year. [12] *662 Krim-Ko Corp. v. Commissioner, 16 T.C. 31, 40 (1951). Petitioner's argument with respect to restrictions on CINB's disposition of the excess interest fails for the same reason, i.e., the contingent repayment obligation does not constitute a "restriction on use" sufficient to prevent application of the claim of right doctrine to excess interest received by CINB. See Healy v. Commissioner, supra at 284. At the close of the years in issue, CINB's repayment obligation depended on there not being any subsequent shortfalls, or prepayments or defaults by CAP Loan borrowers. Thus, it cannot be said that at the end of each of those years CINB had an existing and fixed obligation to repay excess interest to CAP Loan borrowers.[13] *663 Hope v. Commissioner, 55 T.C. 1020, 1030 (1971), affd. 471 F.2d 738 (3d Cir. 1973), cert. denied 414 U.S. 824 (1973). CINB's repayment obligation was more in the nature of a "potential or dormant restriction," which the Supreme Court found to be inadequate to keep receipt under a claim of right from giving rise to income. Healy v. Commissioner, supra.
Nevertheless, petitioner argues that, under the so-called Golsen rule, [14] the holding of the Court of Appeals for the Seventh Circuit in Illinois Power Co. v. Commissioner, supra, dictates the outcome of the CAP Loan issue. Petitioner further argues that that holding "permits petitioner to exclude from income excess interest payments since it was 'not very likely' that [CINB] would ultimately retain these payments." We do not agree. The fallacy of petitioner's argument stems not from the law set forth in that case, but from the misapplication of that law to the facts of this case. In *664 Illinois Power Co., the Illinois Commerce Commission (ICC), the agency responsible for regulating the taxpayer's rates, created a new rate classification in 1974, which had the effect of raising rates for certain commercial customers. The new rate classification was intended to prompt such customers to switch to alternative fuel sources. The ICC ordered that a portion of the additional revenue resulting from the new rate classification be accumulated in a "special fund," but the taxpayer was not ordered to segregate that fund from its other funds. Consequently, the taxpayer commingled the special fund money with money from other sources and the special fund existed only as a series of entries on the taxpayer's books. Although the ICC did not specify exactly how such money was to be disgorged, i.e., when, to whom, or with what interest, until several years later, [15] *665 it made clear from the outset that the taxpayer would not be allowed to keep any of the money which was collected. The court held that the claim of right doctrine was not applicable since the taxpayer never had a claim of right to the special fund money. Illinois Power Co. v. Commissioner, 792 F.2d at 688. The taxpayer knew from the start that it would be required to repay such money with interest and, therefore, that it could derive no benefit from having held the money. Under those circumstances, the taxpayer was nothing more than "an unpaid collection agent, like an employer forced to collect his employees' social security taxes for the government." Illinois Power Co. v. Commissioner, supra at 690. In reaching its conclusion, the court stated that: The underlying principle is that the taxpayer is allowed to exclude from his income money received under an unequivocal contractual, statutory, or regulatory duty to repay it, so that he really is just the custodian of the money. * * * [Emphasis added.] Illinois Power Co. v. Commissioner, supra at 689. In the instant case, however, CINB held the excess interest under a claim of right and it was not under an unequivocal contractual, statutory, or regulatory duty to repay the amount thereof to CAP Loan borrowers. This, coupled with *666 the fact that CINB's use and disposition of the excess interest was unrestricted except for the financial and regulatory requirement that sufficient overall assets be maintained to meet its liabilities, [16] mandates application of the claim of right doctrine. The Seventh Circuit pointed out the distinction on which we think this issue turns: Where, unlike the case of a trustee or a collection agent or a borrower, the taxpayer's obligation to refund or rebate or otherwise repay money that he has received is contingent, the money is taxable as income to him. * * * [Citations omitted.] Illinois Power Co. v. Commissioner, supra at 689. Petitioner asserts that "there was very little likelihood high floating interest rates in the late 1970's would drop precipitously below CAP rates established in the early 1970's." Petitioner also asserts that the likelihood of its "highly creditworthy and sophisticated *667 corporate CAP Loan borrowers" prepaying or defaulting, "thereby depriving themselves of the right to receive substantial prior excess interest payments, was extremely remote." Further, petitioner asserts that the likelihood of retaining excess interest in the event of prepayment or default "was rendered even more remote in light of CINB's design and practice to waive forfeiture provisions in order to enhance customer relationships." Based on those assertions, petitioner argues that the probability of repayment of excess interest was so high as to preclude the inclusion of such excess interest in income. To support its position, petitioner relies upon the following statement: In a world without administrative costs the issue whether a receipt that may have to be repaid is income would be elided. The court would merely ask what the (risk-adjusted) present value of the receipt was, given the probability that it might have to be returned to the payor and the terms and conditions under which the recipient could use the money in the meantime, and the tax would be levied on that value. But this is not the method used; usually the court just asks how likely is repayment, and if the answer *668 is, not very, the receipt is treated as income. Here the likelihood was too great to permit the government to treat the [special fund money] as income. [Emphasis added.] Illinois Power Co. v. Commissioner, supra at 690. However, as is apparent from the preceding discussion of Illinois Power Co., the Seventh Circuit did not simply ask "how likely is repayment." Rather, in determining the taxability of the special fund money that court focused on whether the taxpayer had an unequivocal, as opposed to a contingent, repayment obligation. We think that such a focus is appropriate here. Each of the parties also argues that its position is supported by Franklin Life Insurance Co. v. United States, 399 F.2d 757 (7th Cir. 1968), cert. denied 393 U.S. 1118 (1969). In that case, Franklin Life Insurance Company (Franklin) loaned policy holders amounts against the cash surrender value of their policies. Interest on policy loans was payable in advance. The first payment covered the period between the time of the loan and the end of the policy year; for ensuing years, interest payments were due annually in advance on the policy anniversary date. If interest was not paid when due, Franklin capitalized *669 the interest due by adding it to the principal of the existing loan and charging interest on the increased balance at the same rate. If during the year a borrower either repaid the loan, or surrendered the policy or the policy matured, Franklin retained only that portion of the prepaid interest which was ratably earned and the remainder was refunded. Franklin reported interest as income when it was earned. Thus, if at the close of its tax year, it had earned only a portion of the prepaid interest on a policy loan, only that amount was reported as income. The Commissioner assessed deficiencies because he considered the prepaid interest to be fully taxable, notwithstanding Franklin's contingent duty to refund. In Franklin Life Insurance Co., the court relied on the claim of right doctrine as enunciated in North American Oil Consolidated v. Burnet, 286 U.S. 417 (1932), for its legal conclusion that: The money is "earned" in a context sufficient for full tax recognition in that taxpayer, when it receives the interest, is fully entitled to it under the express terms of the policy loan agreement. And taxpayer is free to use or invest the full sum in any way it sees fit. * * * Franklin Life Insurance Co. v. United States, supra at 762. *670 Respondent argues that the facts of the instant case parallel those of Franklin Life Insurance Co. so closely that the same rationale ought to apply here. We agree with respondent. Petitioner argues that, even though Franklin was required to recognize advance payments of interest on policy loans as income, deferral of excess interest which CINB received with respect to CAP Loans is appropriate because of the high probability of repayment. In support of its position, petitioner relies upon the following statement: Required use of an accrual method of accounting is not a dispensation from the fundamental precept that the accounting clearly reflect that which by a present right to receipt is "earned", and is subject to the taxpayer's dominion and use, although a possibility of its future return may exist. * * * Moreover, taxpayer made no showing of its experience with respect to the return of prepaid interest. It did not demonstrate that any significant amount was actually refunded. * * * [Emphasis added]. Franklin Life Insurance Co. v. United States, supra at 763. We remain unconvinced, however, that a different result would have been reached even if Franklin had shown, as petitioner *671 has here through the use of hindsight, that a significant amount of interest would actually be refunded to policy loan borrowers in subsequent years. Contrary to petitioner's contention, the relevant inquiry is not whether there is a high probability of repayment but whether the repayment obligation is unequivocal or contingent. Illinois Power Co. v. Commissioner, supra.
Although CINB's actual experience reveals that there was a high probability of repayment, it also reveals that there was no certainty as to the repayment of excess interest to CAP Loan borrowers. Cf. Brown v. Helvering, 291 U.S. 193, 201 (1934). Thus, petitioner misplaces its reliance on Illinois Power Co. v. Commissioner, supra, and Franklin Life Insurance Co. v. United States, supra, because those cases were not decided on the basis of repayment probabilities. The Court of Appeals for the Seventh Circuit merely suggested in dicta that a method which takes account of such probabilities might be an "analytically sounder but administratively less feasible method * * *." Illinois Power Co. v. Commissioner, supra at 690. Deposit or Advance Payment of Income Petitioner argues next that, in substance, the excess interest *672 payments which CINB received from CAP Loan borrowers were nontaxable deposits. First, petitioner analogizes excess interest to regular bank deposits, emphasizing that both were recorded on its books as liabilities and subject to a contractual repayment obligation. Second, petitioner relies upon those cases such as Indianapolis Power & Light Co. v. Commissioner, 857 F.2d 1162 (7th Cir. 1988), affg. 88 T.C. 964 (1987), cert. granted U.S. , 109 S.Ct. 1929 (April 24, 1989), which distinguish between security deposits and advance payments of income. Even assuming, arguendo, that the conceptual difficulties encountered in treating excess interest (i.e., portions of particular periodic interest payments) as deposits could be overcome, we reject petitioner's deposit argument as being without merit. As the Supreme Court reiterated in another context in Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974): This Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not * * * and may not enjoy the benefit *673 of some other route he might have chosen to follow but did not. * * * [Citations omitted.] Petitioner's claim that excess interest, in effect, constituted deposits by CAP Loan borrowers comparable to those of other depositors is unfounded. CINB paid no interest on excess interest while interest was presumably paid on regular deposits, and the contractual repayment obligation with respect to excess interest was contingent while it was definite with respect to regular deposits. Under such circumstances, we refuse to convert the debtor-creditor relationships established by CAP Loan agreements into relationships of depositors and holder of deposits merely to satisfy petitioner's desire that excess interest be treated as nontaxable deposits for Federal income tax purposes. We are similarly unimpressed by the support which petitioner attempts to glean from Indianapolis Power & Light Co. v. Commissioner, supra. That case sets forth criteria, albeit different criteria from that set forth in City Gas Co. of Florida v. Commissioner, 689 F.2d 943 (11th Cir. 1982), revg. 74 T.C. 386 (1980), [17] *675 to be used for distinguishing deposits from advance payments, which must generally be included in *674 gross income upon receipt regardless of the recipient's method of accounting for tax purposes. In affirming our decision, the Seventh Circuit held that the proper approach is to determine through an analysis of the facts and circumstances "whether the principal purpose of a 'deposit' is to secure future performance or to serve as an advance payment of income." Indianapolis Power & Light Co. v. Commissioner, supra at 1170. (Fn. ref. omitted.) In that case, we determined the taxability of customer deposits by evaluating the rights retained by customers and the rights acquired by the utility company which held such deposits. Indianapolis Power & Light Co. v. Commissioner, 88 T.C. at 976-978. In this case, petitioner contends that the rights which CAP Loan borrowers retained in the excess interest were so substantial as to render such excess interest nontaxable. We do not agree. Unlike the depositors in Indianapolis Power & Light Co., CAP Loan borrowers did not control the ultimate disposition of excess interest. Indianapolis Power & Light Co. v. Commissioner, 88 T.C. at 977. Dispositions of excess interest depended in part upon interest rates because CINB was entitled under CAP Loan agreements to use excess interest to cover shortfalls. Moreover, the availability of excess interest to cover shortfalls convinces us that it was more in the nature of an advance payment than a deposit. Another factor which indicates that excess interest was not intended as a deposit, and which the Seventh Circuit considers to be "very important," Indianapolis Power & Light Co. v. Commissioner, supra at 1170 n.12, is the fact that CINB paid no interest on excess interest. Indianapolis Power & Light Co. v. Commissioner, 88 T.C. at 978. Thus, contrary to petitioner's contentions, the rights to excess interest were significantly *676 different from those of depositors and a holder of deposits. Advance Payment of Income Finally, petitioner attempts to distinguish this case from a trilogy of Supreme Court cases, Automobile Club of Michigan v. Commissioner , 353 U.S. 180 (1957), American Automobile Association v. United States, 367 U.S. 687 (1961), and Schlude v. Commissioner, 372 U.S. 128 (1963), upon which respondent relied in part when he determined that excess interest was required to be included in income. Those cases stand for the proposition that deferral of prepaid income by an accrual basis taxpayer is not generally permissible for income tax accounting purposes. According to petitioner, however, current recognition of prepaid income is limited under those cases to situations where the recipient is entitled to such income regardless of future events. Thus, petitioner argues that CINB's contingent repayment obligation precludes recognition of excess interest for the years in issue. We reject petitioner's argument because the Supreme Court did not limit the general rule against the deferral of prepaid income in the manner suggested by petitioner. Nor has petitioner shown that those cases do not otherwise *677 apply with respect to excess interest. The narrow exception carved out by the Seventh Circuit in Artnell Co. v. Commissioner, 400 F.2d 981 (7th Cir. 1968), revg. and remanding 48 T.C. 411 (1967), is inapplicable under the circumstances presented here. In that case, a baseball team reported receipts from advance ticket sales as income only if the games to which such receipts related were scheduled to be played during the taxable year. Receipts which related to games scheduled for the succeeding taxable year were deferred. Relying primarily upon the trilogy of Supreme Court cases, we held that receipts from advance ticket sales were includable in income when received. The Seventh Circuit reversed, holding that those cases which we relied upon did not establish a per se rule against deferral of prepaid income. Artnell Co. v. Commissioner, supra at 985. That court concluded that the Supreme Court objected primarily to the uncertainty regarding when prepaid income would be reported and it distinguished the trilogy of cases on that basis. In that connection, the court stated: The uncertainty stressed in those decisions is not present here. The deferred income was allocable to games *678 which were to be played on a fixed schedule. Except for rain dates, there was certainty. We would have no difficulty distinguishing the instant case in this respect. Artnell Co. v. Commissioner , supra at 984. In Artnell, the fixed schedule of dates on which baseball games were to be played effectively eliminated uncertainty regarding when income from advance ticket sales would be reported. In the instant case, however, uncertainty remained with respect to excess interest because CINB's contingent repayment obligation depended upon interest rate volatility and whims of CAP Loan borrowers. Such uncertainty renders the exception carved out in Artnell inapplicable. Petitioner also argues that certain other exceptions support its position with respect to excess interest. Although Rev. Proc. 71-21, 1971-2 C.B. 549, provides an exception to the general rule that income cannot be deferred beyond the year of receipt, its scope is quite narrow and, contrary to petitioner's contention, we find no application for it here. Moreover, respondent's revenue procedure is not substantive law; it merely sets forth guidelines representing the position taken by respondent under circumstances not present *679 here. Virginia Education Fund v. Commissioner, 85 T.C. 743, 751 (1985), affd. 799 F.2d 903 (4th Cir. 1986). By its own terms, [18]Rev. Proc. 71-21 applies strictly to advance payments made pursuant to contracts for the performance of future services. CAP Loan agreements were not contracts which dealt with the performance of future services. Rather, those contracts established the debtor-creditor relationships which existed between CINB and CAP Loan borrowers. Similarly, excess interest payments do not constitute advance payments within the meaning of section 1.451-5, Income Tax Regs., and therefore that section affords no relief from the general rule regarding the inclusion of advance payments in income. Lastly, petitioner argues that respondent's position in this case conflicts with the position set forth in Notice 89-21, *680 1989-8 I.R.B. 23, regarding the tax treatment of lump-sum payments received in connection with "notional principal contracts." Without commenting upon the validity of the position taken in Notice 89-21, we reject petitioner's argument because this case deals with neither lump-sum payments nor "notional principal contracts." Moreover, Notice 89-21 is merely an administrative pronouncement, like a revenue ruling or revenue procedure, which does not constitute authority for deciding a case in this Court. Cf. Follender v. Commissioner, 89 T.C. 943, 958 (1987); Virginia Education Fund v. Commissioner, supra; Neuhoff v. Commissioner, 75 T.C. 36, 46 (1980), affd. 669 F.2d 291 (5th Cir. 1982). Thus, we deem further discussion of Notice 89-21 and the argument which petitioner made in that connection to be unnecessary. Based on the foregoing, we hold that respondent did not abuse his discretion when he determined that CINB's method of reporting interest income with respect to CAP Loans did not clearly reflect income. Accordingly, for the years in issue interest income must be accrued on CAP Loans at the floating rate and in the year when interest payments at that rate were due and payable, *681 or paid, whichever was earlier. Respondent also determined that pursuant to section 481, which relates to adjustments required by changes in accounting method, the $ 16,371,168 balance in CINB's "Interest Collected But Not Earned" account as of January 1, 1977, was required to be included in petitioner's gross income for that year. Petitioner has shown no facts nor made any argument or statement with respect to the application of section 481. There are no facts in the record tending to show that respondent applied that section incorrectly. Therefore, we hold that the adjustment which respondent determined to be necessary under section 481 is required to be made to petitioner's income for the year 1977. Decision will be entered upon disposition of remaining issues. Footnotes
1. The remaining issues were described in that order as "Non-Iranian Loss" issues.↩
2. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as in effect for the years in issue.↩
3. When the lead lender was another bank, prime was generally defined by reference to the prime rate of interest announced by that bank. ↩
4. The term "excess interest" as used herein is intended to be without prejudice to either party, particularly with respect to how amounts thereof are treated for purposes of Federal income tax. Repayments of excess interest to borrowers are referred to in bank parlance as "rebates." 5. In a very few instances, a CAP Loan agreement provided for successive but differing fixed CAP rates.↩
6. The conditions and the specific language implementing them vary slightly depending upon the particular CAP Loan agreement. However, neither petitioner nor respondent argues that such differences should change the result with respect to any amount of excess interest. Likewise, we do not think that such differences bear upon the resolution of the CAP Loan issue. Thus, we find present only those conditions which the parties stipulated as being generally provided in the CAP Loan agreements and we make our decision based on that finding.↩
7. Insignificant differences exist in some of the totals set forth in the Second Stipulation of Facts (CAP Loans). We assume such differences are attributable to rounding or other math errors made in the totaling process. For that reason, we rely on our own summations of the scheduled amounts in arriving at the totals set forth herein.↩
8. Petitioner has not made any argument or statement with respect to the deductibility of anticipated repayments of excess interest. Accordingly, we do not consider that determination to be in issue.↩
9. For taxable years beginning after December 31, 1986, the cash method of accounting for tax reporting is not available to Subchapter C corporations with annual average gross receipts exceeding $ 5,000,000. Sec. 448. See Tax Reform Act of 1986, Pub. L. 99-514, sec. 801(a), 100 Stat. 2085, 2345.↩
10. Applied Communications, Inc. v. Commissioner, T.C. Memo. 1989-469↩.
11. In Fourth Financial Corp. v. Commissioner, T.C. Memo. 1985-232, we faced the flip side of this same issue. In that case, the issue was whether interest payments made to CINB by a particular CAP Loan borrower, Fourth National Bank, were deductible in the year paid. Specifically, we analyzed the deductibility of excess interest because in that case respondent took the position that such excess interest represented nondeductible contingent interest or capital expenditures and that any subsequent repayments received by Fourth National Bank would not be taxable income. Fourth National Bank, on the other hand, argued that interest payments were fully deductible in the years made because it did not have an unconditional right to repayment and the contingencies which kept that right from being unconditional were real and substantial. Under a line of authority set forth in two prior opinions of this Court regarding the deductibility of interest payments subject to a right to reimbursement, Sherman v. Commissioner, 18 T.C. 746 (1952), and Stevens Bros. Foundation, Inc. v. Commissioner, 39 T.C. 93, 125-126 (1962), revd. on another issue 324 F.2d 633↩ (8th Cir. 1963), we concluded that an otherwise proper deduction could not be disallowed because of a right to reimbursement unless the taxpayer was assured of both the right to reimbursement and the amount of the reimbursement. Because all of the contingencies which fixed Fourth National Bank's right to repayment of excess interest were not satisfied by the end of the taxable year in question, we held that it was entitled to deduct the full amount of the interest payments which it had made to CINB.
12. Under certain circumstances, section 1341 offers even greater relief by allowing the taxpayer to choose, in the year of repayment, between a deduction for the amount of the repayment and, in effect, a credit for the amount of tax that would have been saved in the year of inclusion if the repaid amount had been excluded from that year's gross income.
13. At no time prior to loan maturity was there an existing and fixed repayment obligation. Obviously, certain CAP Loans with respect to which borrowers satisfied the conditions entitling them to repayment matured during the years in issue. However, we need not treat such loans separately since the method of adjustment respondent used in making his determination takes account of repayments of excess interest made with respect thereto.
14. See Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940↩ (1971), under which we are required to follow a Court of Appeals decision which is squarely on point where appeal from our decision lies to that Court of Appeals.
15. In 1979, the ICC determined that the taxpayer should pay out the special fund money to certain customers, not the same customers who paid the rate resulting in the fund, through a monthly credit against their gas bills.
16. The financial and regulatory requirement that CINB maintain sufficient assets to meet its liabilities, including its contingent repayment obligation, has not been shown to be a restriction on use or disposition different from that imposed with respect to any of CINB's other income or assets.↩
17. Because this case is appealable to the Seventh Circuit, we determine the merit of petitioner's argument under the criteria which that court uses to distinguish deposits from advance payments. We do not, however, think that the result would be any different under the Eleventh Circuit's City Gas test. The Supreme Court will have an opportunity to reconcile the split of authority in this area when it reviews Indianapolis Power & Light Co. v. Commissioner, 857 F.2d 1162 (7th Cir. 1988), affg. 88 T.C. 964 (1987), cert. granted U.S. , 109 S.Ct. 1929↩ (April 24, 1989).
18. That procedure was promulgated: to allow accrual method taxpayers in certain specified and limited circumstances to defer the inclusion in gross income for Federal income tax purposes of payments received (or amounts due and payable) in one taxable year for services to be performed by the end of the next succeeding taxable year. Rev. Proc. 71-21, 1971-2 C.B. 549↩.